[No. 61787-2.    En Banc.    February 23, 1995.]

THE STATE OF WASHINGTON, *Appellant*, v. TIMOTHY WARNER, *Respondent*.

*Jim Krider, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for appellant.

*Lovie L. Bernardi* of *Snohomish County Public Defender Association,* for respondent.

UTTER, J. — The State of Washington appeals the trial court's dismissal of counts 1, 2, 3, and 4 of an information charging Timothy Warner with five counts of rape of a child in the first degree. The dismissal was based on a finding that the use of disclosures made during court-ordered treatment of a juvenile offender to prosecute that person after he turns 18 violates due process. The Respondent, Timothy Warner, cross-appeals the trial court's finding that there was no pre-accusatorial delay justifying dismissal of the charges. The case was certified to this court by the Court of Appeals, Division Two. For the reasons set forth in the opinion below, we reverse the trial court's order dismissing counts 1, 2, 3, and 4, and remand the case for further proceedings consistent with this opinion.

## FACTS

On March 21, 1990, Timothy Warner, then a 16-year-old juvenile, pleaded guilty in the juvenile division of Snohomish County Superior Court to one count of first degree rape of a child. Prior to being sentenced, Mr. Warner was given an evaluation during which he admitted to sexually abusing P.G. (count 5) and an unnamed female. On May 24, 1990, the sentencing judge found that it would be a manifest injustice to sentence within the standard range, and committed Mr. Warner for 130 weeks' confinement. The disposition order provided that Mr. Warner "be placed in most intensive sex offender treatment program available, in the Dept. of Juvenile Rehabilitation." Clerk's Papers, at 107. Mr. Warner was placed in the sex offender treatment program at Maple Lane. A mandatory expectation of this particular program is that the offender admit and disclose all of his prior victims.

In October 1990, while participating in the treatment program, Mr. Warner disclosed a number of additional victims, including M.K. (counts 1 and 2) and A.K. (count 4). Mr. Warner claims that he also disclosed his sexual abuse of D.D. (count 3) at this time, but the counselors' notes do not

show this disclosure until September 11, 1991. The trial court explicitly declined to resolve this factual conflict.

Mr. Warner was apparently told that Child Protective Services (CPS) would be notified about the information he had provided; however, it is not clear whether he was told before or after he made his first disclosures or whether he was told that the information could be used against him in a later prosecution.

At some point prior to April 16, 1991, Mr. Warner telephoned the mother of A.K. to tell her that he had sexually abused A.K. at a family outing in Plymouth, Benton County. He told A.K.'s mother that as part of his therapy he was to call all of his victims and confess so that they might receive counseling.

On April 16, 1991, King County CPS received a referral about the alleged sexual abuse of A.K. King County CPS subsequently contacted Benton County Police Detective Carlson. He in turn contacted the King County Police who interviewed A.K. on July 9, 1991.

Mr. Warner turned 18 years old on July 20, 1991. In August 1991, the Benton County Prosecutor's office received the police report concerning A.K. On August 28, the Benton County Prosecuting Attorney wrote to Maple Lane requesting information on the abuse of A.K., and Maple Lane's sex offender treatment coordinator Meredith Ingraham responded with a letter dated September 10, 1991.

On September 17, Ms. Ingraham wrote to Sgt. Davis of the Snohomish County Sheriff's office, describing a number of the other victims disclosed by Mr. Warner, including all of those with whose abuse he was ultimately charged. Both M.K. and D.D. were interviewed by the Snohomish County Sheriff's office on March 13, 1992, and on July 15, 1992, the cases were received by the Snohomish County Prosecutor's office. In July 1992, Benton County referred prosecution in the A.K. case to Snohomish County, and the 5-count information was filed on August 21, 1992.

Mr. Warner moved for dismissal of all five counts on the bases of the State's use of statements made during court-

ordered treatment and the precharging delay. The State did not oppose the dismissal of count 5, which the Defendant had revealed prior to the original juvenile disposition.

The trial court explicitly refused to dismiss on the basis of prosecutorial delay, but granted the dismissal based on a finding that the use of disclosures made during court-ordered treatment of a juvenile offender to prosecute that person after he turns 18 violates due process. The court denied the State's motion for reconsideration on February 17, 1993.

## I

### STANDARD OF REVIEW

Respondent asserts the trial court based its dismissal of the charges on its discretion under CrR 8.3(b).[1] Because a decision to dismiss under CrR 8.3(b) is reversible only upon a showing of a manifest abuse of discretion by the trial court, *State v. Dailey*, 93 Wn.2d 454, 459, 610 P.2d 357 (1980), Respondent argues dismissal of the charges should be reviewed according to that highly deferential standard.

The record shows that the trial court did not base its dismissal of the charges on CrR 8.3(b). The rule states any exercise of discretion under the rule "shall" be accompanied by a written order setting out the court's reasons. There was a written order of dismissal in this case, but it did not set out any reasons, nor did it mention CrR 8.3(b).[2] Similarly, the trial court's oral opinion did not mention CrR 8.3(b) and did not indicate in any way that the dismissal was based upon this rule.

---

[1]CrR 8.3(b) states that "[t]he court on its own motion in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution and shall set forth its reasons in a written order."

[2]The order of dismissal, dated December 31, 1992, stated the following: "IT IS HEREBY ORDERED: that after hearing the arguments of counsel, the defendant['s] motion to dismiss is granted pursuant to the court['s] oral opinion of this date. This terminates the prosecution.

"Accordingly, this case is dismissed and the Snohomish County jail shall release the defendant, unless defendant is being held on other charges or orders not under this cause number." Clerk's Papers, at 22.

Thus, we need not apply the abuse of discretion standard that is appropriate under CrR 8.3(b). Instead, we will review the matter de novo under the error of law standard.

The trial court based its decision on an innovative due process ruling — that it is a violation of due process to use statements made pursuant to court-ordered treatment of a juvenile to prosecute that person after turning 18. The court made it clear that the ruling was not based on any type of self-incrimination problem. "I am not suggesting that my ruling would be the same for an adult who made disclosures during treatment and could then be prosecuted." Report of Proceedings (Dec. 31, 1992), at 38. Nor is the ruling based on the delay. "My ruling isn't based upon the prosecutorial delay as such, but on the basis of the due process elements that are present in the prosecutorial delay cases."[3] It is therefore difficult to determine upon what the court based its finding of a due process violation. The court apparently thought both the fact of the delay and that the statements were made during court-ordered treatment were important, but did not base its ruling on either of these issues.

The delay aspect of the case seems to be the most important to the trial court. He found it to be "imminently [*sic*] unfair" that the State waited until Mr. Warner turned 18 to prosecute him. Report of Proceedings, at 38. The court stressed the punishments to which an adult is subjected are much more severe than those to which a juvenile may be. This is exactly the prejudice with which the delay cases are concerned, yet the trial court refused to apply the test set out in those cases.[4] Established case law provides sufficient guidance for the resolution of the issues in this case. The trial court's circumvention of these precedents is unwarranted and constitutes reversible error.

---

[3]Report of Proceedings (Dec. 31, 1992), at 38. The trial court later stated: "[I]t seems to me that the burden would be on the defendant to show that . . . the three elements that are listed in the cases for [prosecutorial delay] have been satisfied, and I am not persuaded that they have been satisfied. That the mere fact that the statement was made ten months before he turned 18, is not sufficient, in my mind, to dismiss these on the basis of prosecutorial delay, and that goes for all five of them." Report of Proceedings, at 42.

[4]See *infra* part III.

## II

### FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION

█ The Fifth Amendment protection against self-incrimination is made applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964). Generally, however, a person must invoke the Fifth Amendment protections in order for them to apply. There are two exceptions to this requirement: (1) custodial interrogation by a state agent (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966)), and (2) situations where the assertion of the privilege would be penalized (*Minnesota v. Murphy*, 465 U.S. 420, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984)). *State v. Post*, 118 Wn.2d 596, 605, 826 P.2d 172, 837 P.2d 599 (1992).

### A

The *Miranda* exception applies to cases where there is a custodial interrogation by a state agent. Thus, there are three requirements for this exception to apply: (1) there must be an interrogation, (2) the interrogation must be custodial, and (3) the interrogation must be conducted by a state agent.

█ "Interrogation" involves some degree of compulsion. *Miranda* was concerned with protecting the privilege against self-incrimination "during 'incommunicado interrogation of individuals in a police-dominated atmosphere.' " *Illinois v. Perkins*, 496 U.S. 292, 296, 110 L. Ed. 2d 243, 110 S. Ct. 2394 (1990) (quoting *Miranda*, 384 U.S. at 445). Such a coercive atmosphere seems to be lacking here. Arguably, there was some compulsion here in that under the circumstances Warner could have felt cooperation (*i.e.*, making confessions) would lead to more lenient treatment or avoid reprisals. This type of "compulsion" is not contemplated in *Miranda*, however. In this case, the relevant admissions — those relating to victims M.K. (counts 1 and 2), A.K. (count 4), and D.D. (count 3) occurred during group therapy sessions conducted by counselors, not during an incommunicado interrogation by police officers.

██ ██ Assuming arguendo this was an interrogation, it must be "custodial" in order to fit within the *Miranda* exception. When dealing with a person already incarcerated, "custodial" means more than just the normal restrictions on freedom incident to incarceration. There must be more than the usual restraint to depart. *Post*, 118 Wn.2d at 607 (citing *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985), *cert. denied*, 479 U.S. 830 (1986)). In *State v. Sargent*, 111 Wn.2d 641, 762 P.2d 1127 (1988), there was a custodial interrogation where the questioning by the probation officer took place in a booth in the King County Jail's visiting area and the defendant was locked in his side of the booth. In *Post*, on the other hand, this court rejected the argument that an interview by a Department of Corrections psychologist was custodial where the interviewee was on work release, even though "Post was 'required' to submit to his evaluation in the sense that it was widely known that if individuals did not cooperate during the interview process, it was a factor considered against them". *Post*, 118 Wn.2d at 603. We held that psychological compulsion is not enough to establish "custody" for *Miranda* purposes. *Post*, 118 Wn.2d at 607. The circumstances surrounding Mr. Warner's disclosures cannot be considered " custodial" in the sense used in the relevant cases.

██ The third requirement for this exception is that the interrogation be carried out "by a state agent". As shown above, the *Miranda* case seems to contemplate interrogation by the police or some other potentially intimidating agent of the State.[5] The implication is that for the purposes of this exception, "state agent" should normally be limited to state officials connected in some way with law enforcement. It is likely, however, any state employee that is conducting a "custodial interrogation" would probably qualify as a state agent for these purposes. Here, the counselors at Maple Lane are state employees, but, for the reasons set out above,

---

[5]*See Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody . . .").

are not of the type that would create a "police-dominated atmosphere". *Illinois v. Perkins*, 496 U.S. at 296.

■ Warner also argues he should have received *Miranda* warnings before each session during which he might reveal new victims.[6] This argument is not persuasive. *Miranda* warnings are intended "[t]o dissipate 'the overbearing compulsion . . . caused by isolation of a suspect in police custody". *Minnesota v. Murphy*, 465 U.S. at 430 (quoting *United States v. Washington*, 431 U.S. 181, 187 n.5, 52 L. Ed. 2d 238, 97 S. Ct. 1814 (1977)). Again, this is not the type of situation envisioned by *Miranda*.

## B

■ Where the State threatens to sanction the exercise of the privilege against self-incrimination, the failure to assert the privilege is also excused. *Post*, 118 Wn.2d at 609. "[T]he 'penalty' exception is available only if (1) the person gives answers that would incriminate him or her in a separate criminal proceeding and (2) the State makes express or implied assertions that exercise of the Fifth Amendment privilege will result in the imposition of a penalty, be it economic loss or deprivation of liberty." *Post*, 118 Wn.2d at 610 (citing *Murphy*, 465 U.S. at 434-35).

The first requirement is satisfied here. Whether there was an incriminating disclosure depends on whether there was "a realistic threat of incrimination in a separate criminal proceeding at the time he made the statements". *Post*, 118 Wn.2d at 610. This case is distinguishable from the facts of *Post*. There, at the time of the interview, Post had not committed any crimes that had not been discovered or charged.

---

[6]The record shows that Warner did receive some type of warning. On the day of his first disclosure, he was told that CPS would have to be notified, but the record is vague as to whether he received this warning before or after making his first disclosures, and as to the content of the warning. Clerk's Papers, at 27. The affidavit of probable cause prepared by Snohomish County Deputy Prosecuting Attorney Ed Stemler contains the following assertion: "According to Darrel Friedt [apparently one of the counselors at Maple Lane], these disclosures occurred after defendant had been cautioned that the counselors would be required to disclose information about other victims to the police who could use that information against him." Clerk's Papers, at 113.

The questions asked and the responses given related to criminal conduct for which Post had already pleaded guilty or been convicted. In this case, there was revelation of previously unknown, and thus uncharged, criminal conduct for which the statute of limitations had not run. The availability of the *Murphy* exception turns on whether there were express or implied assertions by the State the exercise of privilege would result in penalty.

On the one hand, Warner was ordered to participate in the program. According to Meredith Ingraham, sex offender treatment coordinator at Maple Lane, "Complete disclosure of all prior victims is a mandatory treatment expectation in our Sex Offender Treatment Program." Clerk's Papers, at 48. Given the circumstances, it is reasonable to conclude that Warner believed failure to meet the disclosure requirements of the program could be interpreted as a failure to make progress and could lead to a loss of any chance for early release or other action being taken against him. He may have felt a compulsion to reveal victims as a way to satisfy the authorities. In fact, his failure to make progress *did* result in the State taking action against him in the form of further prosecutions. Ms. Ingraham, in a letter to the Benton County Prosecutor, stated: "If we do not see any significant improvement in Tim's treatment progress, then the recommendation would be for prosecution in the adult court system on this current offense [A.K., count 4]." Clerk's Papers, at 41.

On the other hand, this situation is somewhat analogous to that in *Murphy*, where failure to assert privilege was not excused. Although here the specific requirement was that he reveal victims while in *Murphy* it was just that he tell the truth, the record seems to suggest that, contrary to the assertion in Respondent's Brief, at 19, Warner did not feel compelled to reveal the victims. The counselors' notes contain the following entry dated September 17, 1991: "Tim wanted to discuss the [wisdom] of his revelation of further victims . . . [Advised] him that he has made the right [decision]." This entry appears to suggest that neither Warner

nor his counselors saw the revelations as compelled, but rather a decision to be made by the patient, in this case Warner.

Since the question is whether the statements were voluntary, and there are a number of factual ambiguities, we remand this case for a factual determination on the question of whether the disclosures were compelled by the threat of a penalty.

## C

■ If on remand it is found that Mr. Warner's Fifth Amendment privilege against self-incrimination has been violated, the proper remedy is the suppression of the incriminating statements, rather than dismissal of the case. *United States v. Blue*, 384 U.S. 251, 255, 16 L. Ed. 2d 510, 86 S. Ct. 1416 (1966).

■ Moreover, any evidence that the prosecution discovered as a direct result of a compelled incriminating statement must be suppressed under the "fruit of the poisonous tree" doctrine, *Wong Sun v. United States*, 371 U.S. 471, 484, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), unless it falls within one of the exceptions. There are two exceptions to the doctrine that are relevant here.

■ First, if the "fruit" is sufficiently attenuated from the original illegality, then it may be admitted. *Nardone v. United States*, 308 U.S. 338, 341, 84 L. Ed. 307, 60 S. Ct. 266 (1939). For example, if there are intervening independent factors in the chain of causation from the original illegality to the evidence in question, the evidence will not be suppressed as "fruit". Also, if there was an independent source for the evidence, then it need not be excluded. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 64 L. Ed. 319, 40 S. Ct. 182, 24 A.L.R. 1426 (1920). In this case, at least in regard to victim A.K. (count 4), there are essentially two sources for the witness testimony: the admissions Warner made during the group therapy sessions and the phone call to A.K.'s mother. The trial court must determine whether either or both of these admissions were compelled by the threat of a penalty. If only one was so compelled, then the other would

constitute an independent source and the resulting witness testimony and any other "fruits" need not be excluded. If both were compelled, then the trial court must determine whether the string of causation was sufficiently attenuated so as to bring it within the exception.

■ Second, the "fruit" of the incriminating statement will be admissible if the prosecution can show that the evidence inevitably would have been discovered absent the incriminating statement. *Nix v. Williams*, 467 U.S. 431, 444, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984). The prosecution bears the burden of proving, by a preponderance of the evidence, that the challenged evidence would have been discovered eventually by lawful means. *Nix v. Williams*, 467 U.S. at 444. Absolute inevitability of discovery is not required but simply a reasonable probability that evidence in question would have been discovered other than from the tainted source. *United States v. Brookins*, 614 F.2d 1037 (5th Cir. 1980). There is a very long statute of limitations in these cases, RCW 9A.04.080(1)(c), which allows the victims until they reach 21 years of age to come forward. This statute, therefore, increases the likelihood of eventual discovery.

## III

### PREACCUSATORIAL DELAY

■ *State v. Dixon*, 114 Wn.2d 857, 864, 792 P.2d 137 (1990) sets out a 3-step test to determine whether a preaccusatorial delay violates due process where the delay leads to a loss in juvenile jurisdiction: (1) the defendant must show prejudice resulting from the delay; (2) the court must consider the reasons for the delay; and (3) if the State can justify the delay, the court will engage in balancing the State's interest against the prejudice to the accused. *Dixon*, 114 Wn.2d at 860 (citing *United States v. Lovasco*, 431 U.S. 783, 53 L. Ed. 2d 752, 97 S. Ct. 2044 (1977)).

■ There is no constitutional right to be tried as a juvenile. *State v. Sharon*, 33 Wn. App. 491, 494, 655 P.2d 1193 (1982), *aff'd*, 100 Wn.2d 230, 668 P.2d 584 (1983). However, a delay that causes the loss of juvenile court jurisdiction will

satisfy the minimal requirements of prejudice under the first prong of the test as a matter of law because it does result in the loss of certain benefits. *Dixon*, 114 Wn.2d at 861.

The reasons for the delay are either that the counselors at Maple Lane failed to comply with the statute and report the information regarding revealed victims to CPS within the statutory period, or that CPS failed to comply and report the instance to the police, or both. In any event, the police and prosecutor did not know of the crimes until much later than they were first revealed to the staff at Maple Lane. Once the law enforcement officials were informed, the pace of the investigation was in no way unusual.

The ultimate issue in balancing the interests is "whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *State v. Lidge*, 111 Wn.2d 845, 852, 765 P.2d 1292 (1989) (quoting *State v. Calderon*, 102 Wn.2d 348, 353, 648 P.2d 1293 (1984)). The State is given a great deal of discretion over the decision of when to file charges.[7]

This court has recognized only two circumstances where delay can justify vacating a conviction: (1) an intentional delay by the State to circumvent the juvenile justice system will violate due process, and (2) a negligent delay *may* violate due process. *Lidge*, 111 Wn.2d at 848. There is no allegation in this case that the delay was intentional, and the evidence is insufficient to show negligence.

Warner cannot establish negligence solely on the basis of a violation of the mandatory reporting provisions of RCW

---

[7]Legitimate reasons for waiting to file charges may include: sequential prosecution in order to secure the testimony of a codefendant (*Dixon*, 114 Wn.2d at 861; *State v. Boseck*, 45 Wn. App. 62, 67, 723 P.2d 1182 (1986)); waiting for lab results because of backlog at state crime lab (*State v. Calderon*, 102 Wn.2d 348, 648 P.2d 1293 (1984)); ongoing large scale undercover drug buying operation (*State v. Robbers* 46 Wn. App. 558, 731 P.2d 522 (1986), *review denied*, 108 Wn.2d 1005 (1987)); routine administrative practices such as vacation time, compensation time, and training time (*State v. Alvin*, 109 Wn.2d 602, 746 P.2d 807 (1987)).

26.44.030. The doctrine of negligence per se has been largely abolished in Washington by statute. RCW 5.40.050. *See also Hansen v. Friend*, 118 Wn.2d 476, 483, 824 P.2d 483 (1992). The statutory violation can only be used as evidence of negligence. This violation does not provide very strong evidence of negligence, however. Even under the old negligence per se doctrine, a person can only borrow a statutory duty of care to show negligence if the harm that occurs is the type of harm that statute is designed to prevent and the person claiming it is in the class of persons the statute is designed to protect. *Herberg v. Swartz*, 89 Wn.2d 916, 923, 578 P.2d 17 (1978). That is not the case here. The reporting statute is designed to secure prompt protection and/or treatment for the victims of child abuse. The class of persons it is designed to protect is the victims, not the abusers. Thus, Warner cannot use the statute to establish negligence on the part of the State.

▆ Looking beyond the statute, the question remains whether this delay in reporting to the police was negligent. Absent the statutory requirements, this delay in reporting does not rise to the level of negligence. It is reasonable to assume that the counselors at Maple Lane and/or CPS may have wanted to wait until they believed that Mr. Warner had revealed all of his victims until a report was made to prosecuting authorities. Even if the counselors did report each victim to the police as it was revealed, there is no evidence that the police would have proceeded any sooner. Nor is there any reason to say that they should have. The prosecutor may have wanted to hold off on filing charges until more victims had been revealed, rather than bring separate charges each time Mr. Warner revealed a new victim during the course of his treatment. Neither the due process clause nor Washington statute requires that police or prosecutors employ special procedures for dealing with a juvenile suspect who is approaching his 18th birthday. *State v. Alvin*, 109 Wn.2d 602, 605, 746 P.2d 807 (1987) (quoting *State v. Calderon*, 102 Wn.2d 348, 354, 648 P.2d 1293 (1984)). Thus, Respondent has failed to show negligence on the part of the State, and the preaccusatorial delay, therefore, cannot justify dismissal of the charges.

## IV

### WARNER'S POLICY ARGUMENT

Respondent makes a vigorous public policy argument. Br. of Resp't, at 27. Respondent argues that if sex offender treatment programs are to be successful at treating youthful offenders, the offender "must be encouraged to participate in court-ordered treatment". Prosecution based on admissions made during treatment will inevitably discourage good-faith participation in treatment programs, and will adversely affect the probability of successful treatment.

The Legislature has addressed the need to foster an atmosphere where therapy can succeed. To that end, the Legislature enacted the psychologist-client privilege. RCW 18.83.110 provides that:

> Confidential communications between a client and a psychologist shall be privileged against compulsory disclosure to the same extent and subject to the same conditions as confidential communications between attorney and client, . . ..

The psychologist-client privilege does not apply in this case, however. Another statutory provision creates a clear exception to this privilege. RCW 26.44.030 contains a mandatory reporting provision for cases of child abuse that trumps the statutory privilege. "[I]t is evident that, in its recent enactments, the legislature has attached greater importance to the reporting of incidents of child abuse and the prosecution of perpetrators than to counseling and treatment of persons whose mental or emotional problems cause them to inflict such abuse." *State v. Fagalde*, 85 Wn.2d 730, 736, 539 P.2d 86 (1975). Since the Legislature has spoken on this issue, and has indicated that the policy objective of having child abuse reported is more important than fostering confidentiality in the treatment of the abusers, it is not the court's role to question that legislative judgment.[8]

---

[8]Even if the mandatory reporting provision of RCW 26.44.030 did not exist, the psychologist-client privilege would not apply in this case. Like all privileges, the psychologist-client privilege does not apply if it is clear that the client did not intend the communications to be confidential. *State v. Post*, 118 Wn.2d 596, 612, 826 P.2d 172, 837 P.2d 599 (1992). An objective test applies here; the client's intent that the communication be confidential must be reasonable under the

## CONCLUSION

The trial court's order dismissing counts 1, 2, 3, and 4 against Mr. Warner is reversed. Mr. Warner has failed to show that the State was negligent in failing to bring the charges earlier than it did. The case is remanded for further factfinding on the issues of whether this case fits within the "penalty exception" to the requirement that the Fifth Amendment privilege must be asserted, and if so, whether any of the exceptions to the "fruit of the poisonous tree" doctrine apply.

DURHAM, C.J., DOLLIVER, SMITH, GUY, JOHNSON, and MADSEN, JJ., and ANDERSEN and BRACHTENBACH, JJ. Pro Tem., concur.

Reconsideration denied May 9, 1995.

circumstances. *State v. Post*, 118 Wn.2d at 612. Where the examination is conducted for purpose of providing a third party with information, there is clearly no confidentiality anticipated or expected. *J.N. v. Bellingham Sch. Dist. 501*, 74 Wn. App. 49, 63-64, 871 P.2d 1106 (1994). Although it is a harder case where the purpose of the communication is treatment, the record shows that in this case, Warner did not have an expectation of confidentiality since he was informed that there would be disclosure. Clerk's Papers, at 27, 42. Moreover, a privilege is waived if it is not asserted or if there is a voluntary disclosure of the communication by the holder of the privilege to a third person. Finally, privileges are generally disfavored in criminal cases. *See, e.g., United States v. Burtrum*, 17 F.3d 1299, 1302 (10th Cir. 1994). This policy is especially strong in child sex abuse cases. *Burtrum*, at 1302.