[No. 33981-1-II.   Division Two.   September 11, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. TERRY WINTERSTEIN, *Appellant.*

678

*Anne M. Cruser*, for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *James B. Smith, Deputy*, for respondent.

¶1 PENOYAR, J. — Terry Winterstein was under the supervision of Community Corrections Officer (CCO) Rongen. Based on alleged probation violations, including a tip that Winterstein was manufacturing methamphetamine at his residence, CCO Rongen led a team of officers to search the property. The officers discovered an active methamphetamine lab in a travel trailer, as well as evidence of manufacturing in a bedroom of the mobile home on the property. The bedroom was later identified as Bror Soderlind's, and Soderlind ultimately pleaded guilty to manufacturing methamphetamine. Winterstein was charged as an accomplice, and a jury convicted him as an accomplice to the unlawful manufacture of methamphetamine. Following the trial, Winterstein filed a CrR 7.8 motion for relief from judgment based on newly discovered evidence that Department of Corrections (DOC) had been notified of his address change prior to the search. The motion was denied, and Winterstein now appeals, claiming that (1) the trial court

erred by not issuing his proposed jury instructions regarding a landlord's accomplice liability, (2) the evidence is not sufficient to support his conviction, and (3) the evidence from the search should have been suppressed. None of his arguments is persuasive, and we affirm.

## FACTS

### I. SEARCH

¶2 On February 5, 2003, CCO Rongen received information from Clark-Skamania Drug Task Force officers that Terry Winterstein, who was under supervision after a gross misdemeanor conviction,[1] was manufacturing methamphetamine at his residence. Based on this information, Winterstein's failure to report as required, and a prior positive test for methamphetamine, CCO Rongen planned to search Winterstein's residence the next day.

¶3 CCO Rongen had previously met with Winterstein at his residence, 646 Englert Road. At that time, Winterstein gave him a tour of the mobile home. There were three bedrooms in the mobile home, and Winterstein informed CCO Rongen that he could not go into the other bedrooms because they were not his. CCO Rongen also met Winterstein's girl friend, Sunshine O'Connor, who was living with him at the time.

¶4 Officers observed several structures on the property when they arrived on February 6, including the mobile home (646 Englert Road), a motor home (646½ Englert Road), and a travel trailer. The numbers "646" and "646½" were spray-painted on the front of the mobile home and the motor home, respectively. Report of Proceedings (RP) (Jun. 28, 2005) at 251-52.

¶5 CCO Rongen, accompanied by officers from DOC and the Clark-Skamania Drug Task Force, and Detective

---

[1] Winterstein pleaded guilty to malicious mischief in September 2002. He was imprisoned for less than one year and began reporting for community supervision in October 2002.

Watson (from the Cowlitz-Wahkiakum Narcotics Task Force), initially approached the mobile home. CCO Rongen testified that when he arrived at the entrance to the mobile home, the door was open. He stated that he announced himself as from DOC, and "a male voice [said], 'Yeah, come on in.'" 1 RP (Dec. 20-23, 2004) at 64.

¶6 There were four people at the mobile home when CCO Rongen entered—Bror Soderlind, Sunshine O'Connor, and another man and woman. Winterstein was not present. CCO Rongen collected these people in the living room and then went back down the hallway, where he observed "paraphernalia-type items" in the bedrooms. 1 RP (Dec. 20-23, 2004) at 65. He testified that he did not enter the other rooms but from the hallway, he saw a scale and a substance he believed to be red phosphorous in one of the bedrooms (later identified as Soderlind's). He then alerted the drug task force officers that there may be a methamphetamine lab. At that time, Detective Watson advised CCO Rongen to stop searching.

¶7 From the doorway of Soderlind's bedroom, Detective Watson could see red phosphorous, blister packs of Sudafed, a white powder substance, and a scale. Detective Watson looked through the house to see if there was any cause for immediate concern. He then removed everyone from the house and secured the scene until a search warrant could be obtained.

¶8 While the officers were waiting for the search warrant, Winterstein returned to the property. Upon seeing the officers, Winterstein "sped out of there." 1 RP (Dec. 20-23, 2004) at 70. The officers briefly pursued him, but they were unable to apprehend him.

¶9 After obtaining a search warrant, officers from the two narcotics task forces searched all structures on the property and discovered an active methamphetamine manufacturing lab in the travel trailer. The officers also searched the motor home, but both Detective Hess and

Detective Watson testified that it did not appear that anyone was living in it.[2]

¶10 Based on evidence recovered from the search, Winterstein was charged with unlawful manufacture of methamphetamine.[3]

II. TRIAL

¶11 Winterstein was tried by a jury in December 2004. At trial, the State argued that he was guilty as Soderlind's accomplice, but the defense claimed that he was merely Soderlind's landlord and not an accomplice.

¶12 Soderlind agreed to testify at Winterstein's trial after receiving immunity from further prosecution. He stated that he was living with Winterstein and O'Connor at the time of the search—specifically, that Winterstein was still living at 646 Englert Road at the time of the search. He paid Winterstein $100 per month in cash to live there.

¶13 According to Soderlind, he would manufacture methamphetamine in the travel trailer on the property, which Winterstein and another man brought in. Winterstein also ran electricity out to the trailer, at Soderlind's request, and with no questions asked. When asked whether he had informed Winterstein that he was cooking methamphetamine on the property, Soderlind stated, "I never told him when I would be. He was aware at one time that I was, but I never did state when." 3 RP (Dec. 20-23, 2004) at 356.

¶14 Soderlind testified that he cooked the methamphetamine by himself and that Winterstein never bought cold tablets for him. However, Soderlind did provide Winterstein

[2] Detective Hess testified that it looked like the motor home was being used for storage; Detective Watson agreed and stated that there was no pathway from one end of the motor home to the other—"either a box or [a] car part" blocked the path. 2 RP (Dec. 20-23, 2004) at 288.

[3] Soderlind, Winterstein's tenant, pleaded guilty to one count of manufacturing methamphetamine on July 9, 2003 (the possession charge was dismissed). He was sentenced to 40 months imprisonment and 9-12 months community custody, and he is currently appealing in linked case no. 33672-3-II (*State v. Soderlind,* noted at 140 Wn. App. 1026 (2007)).

with methamphetamine ("never a contractual amount"), and Winterstein never ordered Soderlind to stop manufacturing methamphetamine on his property. 3 RP (Dec. 20-23, 2004) at 356-57.

¶15 Katherine Boyer, a Walgreen's employee, testified that Winterstein came into the store on a regular basis to buy pseudoephedrine-based cold medicines. She stated that "he was probably in there just about every [shift]," and he would purchase the maximum amount of medicine (3 packets). 3 RP (Dec. 20-23, 2004) at 333. Austin Fogelquist, another Walgreen's employee, also testified that Winterstein was a regular customer in the store and would purchase the maximum amount of pseudoephedrine products allowed by law.

¶16 In his defense, Winterstein called three witnesses who testified that he was living with his brother, not at 646 (or 646½) Englert Road. Winterstein proposed jury instructions based on *State v. Roberts*, 80 Wn. App. 342, 355-56, 908 P.2d 892 (1996), regarding precisely what is necessary to convict a landlord of manufacturing a controlled substance based on an accomplice theory. The trial court rejected his proposed instructions and instead issued a general accomplice instruction.

¶17 The jury returned a guilty verdict on December 23, 2004.

III. POSTTRIAL MOTIONS

¶18 Before trial, Winterstein maintained that he had changed his address with a DOC kiosk weeks before the search, from 646 Englert Road to 646½ Englert Road. Therefore, he claimed the search was illegal. Both Soderlind's attorney and Winterstein's attorney filed suppression motions based on this information. However, CCO Rongen informed Soderlind's attorney that Winterstein had only changed his address on February 6, 2003—the same day as the search. Based on this information, attorneys for both Soderlind and Winterstein abandoned their suppression

motions. Consequently, Soderlind pleaded guilty and Winterstein went to trial.

¶19 However, immediately before submitting the exhibits to the jury, Winterstein's attorney and the prosecutor examined each document within each exhibit. In a box of miscellaneous documents, which the police had seized from the mobile home, they discovered a DOC billing statement dated January 13, 2003, addressed to Winterstein at the new address.

¶20 Following Winterstein's conviction, both Winterstein and Soderlind filed CrR 7.8 motions for relief from judgment. Winterstein argued for relief under 7.8(b)(2), (3), and (5), based on newly discovered evidence, the misrepresentations of an adverse party, and Winterstein's constitutional right to be free from unreasonable search and seizures. All parties agreed that Winterstein and Soderlind would litigate their respective motions in the form of a suppression motion.

¶21 At the suppression motion hearing, CCO Rongen claimed that probationers needed permission from him before they changed their addresses. He also testified that although information from DOC kiosks was available on his computer, he did not look at that database before executing the search at Winterstein's property.

¶22 The trial court did not enter written findings of fact and conclusions of law, but it orally found that DOC had notice of Winterstein's change of address before January 13, 2003. The court then stated:

> The Department had notice of his attempted change of address. Mr. Rongen had notice of his last approved, apparently, address.
>
> And this is a key finding here. 646 and a ½ was not his address. He lived at 646. The change of address to 646 and a ½ was a ruse. Now, I say that because when Mr. Rongen went to the house in February, Mr. Winterstein's room was the same as it had been when he had been there in January. When he asked the girlfriend if Mr. Winterstein still lived in the house, the girlfriend said yes.

Mr. Soderlind testified, he said Mr. Winterstein still lived in the house. And the detective said, nobody was living in the motor home. It was a ruse. So, when the officer goes there, acting in good faith, to his actual address, without knowledge that the Defendant has attempted to change his address by way of a ruse, is he bound by it[?] I don't think so. I don't think he's bound by the ruse.

The only point as far as I can tell—the only inference I can get from this is that he did this so they wouldn't come and search his house. They would go search in the motor home that was next door, that nobody was living in.

RP (Jun. 28, 2005) at 292-93.

¶23 The trial court denied Winterstein's suppression motion and CrR 7.8 motion for a new trial. It declined to address the scope of the search and the unreasonableness of searching the home on a misdemeanor without further briefing. This appeal followed.

## ANALYSIS

### I. JURY INSTRUCTIONS

¶24 Winterstein argues that the trial court erred by refusing to give the jury his proposed instructions based on *Roberts*, 80 Wn. App at 355-56. Specifically, he claims that the accomplice instruction given inadequately addresses a situation where a landlord is present and may have knowledge of the activity but fails to take affirmative steps to stop it. We disagree.

¶25 Jury instructions are sufficient if they are supported by sufficient evidence, they allow the parties to argue their theories of the case, and, when read as a whole, they properly inform the jury of the applicable law. *State v. Riley*, 137 Wn.2d 904, 908 n.1, 909, 976 P.2d 624 (1999). We review the adequacy of jury instructions de novo as a question of law. *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). It is prejudicial error to submit an issue to the jury that the evidence does not support. *State v. Clausing*, 147 Wn.2d 620, 627, 56 P.3d 550 (2002) (citing *State v.*

*Fernandez-Medina*, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000)).

■■ ¶26 Winterstein proposed the following three instructions, citing *Roberts*, 80 Wn. App. at 355-56, for each:

As a matter of Washington State law, a person is not an accomplice in the commission of manufacturing a controlled substance merely because that person is the landlord of the manufacturer, accepts rent from the manufacturer, knows or becomes aware of the manufacturing on the rented premises, pays utilities for the tenant manufacturer, and fails to remove or report the manufacturing operation. Such evidence is evidence of mere presence and knowledge.

Clerk's Papers (CP) at 105.

A person is not an accomplice in the commission of a crime merely because that person rents premises to another person and that other person then commits a crime, even if the landlord knows or becomes aware that the renter is using the premises to commit a crime. The landlord is not required to remove the criminal operation on the rented premises and is not required to report the criminal operation to the police. The landlord is also not required to stop accepting rent or to stop providing utility service to the renter.

CP at 125.

A person is not an accomplice in the commission of a crime merely because that person rents premises to another person and that other person then commits a crime, even if the landlord knows or becomes aware that the renter is using the premises to commit a crime. The landlord is not required to remove the criminal operation on the rented premises and is not required to report the criminal operation to the police.

CP at 126.

¶27 The court rejected these proposed instructions and instead gave the following accomplice instruction:

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

A person is an accomplice in the commission of the crime of manufacturing methamphetamine if, with knowledge that it

will promote or facilitate the commission of manufacturing methamphetamine, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the manufacture of methamphetamine; or

(2) aids or agrees to aid another person in planning or committing the manufacture of methamphetamine.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

Instruction 9, CP at 119.

¶28 This accomplice instruction properly informed the jury of applicable law and still allowed the defense to argue its theory of the case. The instruction specifically states that "more than mere presence and knowledge" is necessary. Instruction 9, CP at 119. There was no need to instruct the juries on the intricacies of the *Roberts* opinion or specifically instruct them on accomplice liability for landlords. The defense was still free to argue (and did argue) that Winterstein was merely a landlord and did not know of or aid Soderlind's manufacturing operation. The trial court did not err in rejecting Winterstein's proposed instructions; the court's instructions were entirely proper.

II. SUFFICIENCY OF THE EVIDENCE

■ ■ ¶29 Winterstein, citing *Roberts*, 80 Wn. App. at 355-57, also claims that the evidence was insufficient to support his conviction because a landlord cannot be convicted as an accomplice by merely providing premises, having knowledge of the operation, and failing to take action. The State disagrees, pointing out that the evidence established (1) Winterstein's frequent purchases of large amounts of pseudoephedrine, (2) that Winterstein helped set up the trailer used for manufacturing and connected electrical power to it, and (3) that Winterstein fled the scene when CCO Rongen confronted him.

¶30 The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *Salinas*, 119 Wn.2d at 201.

¶31 Winterstein's argument is not persuasive. After obtaining the search warrant, officers observed two methamphetamine pipes in Winterstein's bedroom. Additionally, Soderlind testified that Winterstein helped bring the travel trailer onto the property and hooked up the electricity to it, despite the fact that Soderlind had arranged to live in the mobile home and had no intention of living in the travel trailer. Finally, the testimony from two Walgreen's employees that Winterstein regularly bought pseudoephedrine-based cold medicines (in the maximum amount allowable under Washington law) unmistakably points to Winterstein's aiding Soderlind in the manufacturing operation. The evidence here was clearly sufficient to convince any rational trier of fact of Winterstein's guilt beyond a reasonable doubt.

III. WARRANTLESS SEARCH

¶32 As stated above, the trial court did not enter written findings of fact and conclusions of law. Therefore, Winterstein and the State base their arguments on the findings and conclusions contained in the court's oral ruling. The State assigns error to the trial court's findings regarding Winterstein's change of address, and Winterstein assigns error to its conclusions regarding the legality of the search.

A. Change of Address

¶33 In reviewing a trial court's denial of a suppression motion, we review challenged findings of fact for

substantial supporting evidence. *State v. Lawson*, 135 Wn. App. 430, 434, 144 P.3d 377 (2006) (citing *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the finding. *Mendez*, 137 Wn.2d at 214.

¶34 The State assigns error to the trial court's findings of fact that (1) Winterstein was not required to obtain DOC approval prior to changing his address and (2) Winterstein had properly effected a change of address with DOC prior to the search. According to the State, Winterstein was required to obtain DOC preapproval for any address change. Because he did not do so, he did not properly effect a change of address and the search of 646 Englert Road was justified.

■ ■ ¶35 Each of these findings is supported by substantial evidence. Winterstein's DOC conditions state that he should "[n]otify the community corrections officer before changing residence," not that he must obtain permission first. CP at 212. The conditions are specific where *permission* is required, rather than *notification*. CCO Rongen's testimony was the sole evidence indicating that permission was required. However, credibility determinations are for the trier of fact and we do not review them on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). The written conditions are sufficient to persuade a fair-minded person that notification of Winterstein's address change was all DOC required.

¶36 Additionally, substantial evidence supports the finding that Winterstein had properly effected a change of address. DOC clearly had been notified of his new address, as evidenced by the DOC billing statement and the notice of violation, both of which listed Winterstein's address as 646½ Englert Road. Again, CCO Rongen's testimony is the only evidence that controverts the trial court's finding, and the trial court was the proper judge of his credibility. Substantial evidence supports the court's finding that DOC was properly notified of Winterstein's new address.

¶37 In the alternative, the State argues that the search was justified "under the good faith exception to the warrant requirement." Resp't's Br. at 12. We reject this argument. Washington courts have consistently declined to create "good faith" exceptions to the exclusionary rule in cases in which warrantless searches were based on a reasonable belief by law enforcement officers that they were acting in conformity with one of the recognized exceptions to the warrant requirement. *State v. Morse*, 156 Wn.2d 1, 9-10, 123 P.3d 832 (2005). To accept a "good faith" exception here would violate longstanding precedent, and we decline to do so.

B. Legality of the Search

¶38 Winterstein argues that the trial court erred in denying his motion for relief from judgment because CCO Rongen lacked the legal authority to search the residence at 646 Englert Road. According to Winterstein, "there can be no question that CCO Rongen made a material misrepresentation to [Soderlind's attorney, Winterstein's attorney, and the prosecutor]." Appellant's Br. at 33. He claims that Winterstein did effectuate an official change of address with DOC, and the trial court therefore erred in concluding that the search of the residence was justified.[4]

¶39 Warrantless searches of constitutionally protected areas are presumed unreasonable absent proof that one of the well-established exceptions applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). Exceptions to the warrant requirement are to be " 'jealously and carefully drawn.' " *State v. Hendrickson*, 129 Wn.2d 61, 72, 917 P.2d 563 (1996) (internal quotation marks omitted) (quoting *State v. Bradley*, 105 Wn.2d 898, 902, 719 P.2d 546 (1986)). The State bears the burden of establishing an exception to the warrant requirement. *State v. Potter*, 156 Wn.2d 835, 840, 132 P.3d 1089 (2006).

---

[4] Detective Watson testified at trial that the assessor's office informed him that the property had not been officially subdivided.

■ ¶40 Washington recognizes a warrantless search exception, when reasonable, to search a parolee or probationer and his home or effects. *State v. Campbell*, 103 Wn.2d 1, 22-23, 691 P.2d 929 (1984) (citing *Hocker v. Woody*, 95 Wn.2d 822, 826, 631 P.2d 372 (1981)); *see State v. Coahran*, 27 Wn. App. 664, 666-67, 620 P.2d 116 (1980). A probation or parole officer may search the probationer's home without a warrant so long as the search is reasonable and is based upon a well founded suspicion that a violation of probation has occurred. *State v. Lucas*, 56 Wn. App. 236, 244, 783 P.2d 121 (1989); *State v. Simms*, 10 Wn. App. 75, 87, 516 P.2d 1088 (1973); *Coahran*, 27 Wn. App. at 666-67. A " 'wellfounded suspicion' " is analogous to the cause requirement of a *Terry* stop. *Simms*, 10 Wn. App. at 87 (quoting *State v. Chatmon*, 9 Wn. App. 741, 745, 515 P.2d 530 (1973)); *Terry v. Ohio*, 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

¶41 Reasonable suspicion for a *Terry* stop must be based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search]." *Terry*, 392 U.S. at 21. A reasonable suspicion requires only sufficient probability, not absolute certainty. *New Jersey v. T.L.O.*, 469 U.S. 325, 346, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985).

■ ¶42 In this case, Winterstein concedes that CCO Rongen had a well-founded suspicion that Winterstein had violated his probation conditions. The issue here is whether CCO Rongen had the authority to search 646 Englert Road, not Winterstein's current self-reported address, due to that well-founded suspicion. According to Winterstein, "CCO Rongen could have developed some basis to search 646 Englert Road if he had conducted some investigation showing that Mr. Winterstein could be found at that residence on February 6th, 2003." Appellant's Br. at 42.

¶43 Washington case law does not appear to address the lengths to which an officer must go to ensure that the address he or she is searching is, indeed, the probationer's residence. Therefore, we choose to apply *Terry*'s "specific

and articulable facts" standard to whether officers are searching an appropriate address.

¶44 In this case, CCO Rongen had two possible sources of information regarding Winterstein's current residence: (1) the information in the DOC database and (2) his previous experience meeting Winterstein at his residence at 646 Englert Road.

¶45 The DOC database information was changed by Winterstein without any face-to-face contact or investigation into whether he was truly moving. CCO Rongen could have, and arguably should have, searched the DOC database before searching the property. However, he had a reasonable belief that Winterstein's residence was still the mobile home. CCO Rongen testified that, as he understood Winterstein's conditions of supervision, he had to approve any change of address before Winterstein could move. He had not approved any address change, so he very likely believed that Winterstein remained at the mobile home. Additionally, given CCO Rongen's previous contact with Winterstein and the fact that the new purported address was a motor home on the same premises, it was reasonable for CCO Rongen to conclude that Winterstein still resided at the old address, even if CCO Rongen had checked DOC's address database.

¶46 Specific and articulable facts supported CCO Rongen's belief that Winterstein still lived in the mobile home. Under this standard, the search was not improper, and the trial court did not err in denying Winterstein's suppression motion. We affirm.[5]

C. Inevitable Discovery

¶47 Additionally, under the doctrine of inevitable discovery, Winterstein's address change does not affect

---

[5] In the linked case, *State v. Soderlind*, No. 33672-3-II, noted at 140 Wn. App. 1026, we noted that this search should have been limited to those rooms known to belong to Winterstein and the common areas of the mobile home. Because the evidence in Soderlind's bedroom was in plain view from the common area of the hallway, however, the evidence discovered did not have to be suppressed.

suppression of the evidence. The inevitable discovery doctrine applies when there is a reasonable probability that the evidence in question would have been discovered other than from the tainted source. *State v. Warner*, 125 Wn.2d 876, 889, 889 P.2d 479 (1995).

¶48 Had the officers searched the motor home first, they would have found it full of boxes and uninhabitable. Upon finding this, they would have likely and reasonably proceeded to the mobile home, asked those inside whether Winterstein still lived there (as they did) and, receiving affirmative answers, would have proceeded exactly as they did. Therefore, it is reasonably probable that the evidence would still have been discovered despite Winterstein's ruse.

¶49 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, C.J., and QUINN-BRINTNALL, J., concur.

Review granted at 163 Wn.2d 1033 (2008).