[No. 17388-3-II.    Division Two.    November 28, 1995.]

THE STATE OF WASHINGTON, *Appellant*, v. THOMAS J. WERNER, *Respondent*.

874

*Steward Menefee, Prosecuting Attorney*, and *James P. Hagarty, Deputy*, for appellant.

*Arthur A. Blauvelt, Tamara J. Darst*, and *Ingram, Zelasko & Goodwin*, for respondent.

MORGAN, J. — The State appeals a judgment of dismissal that followed an order granting Thomas J. Werner's motion to suppress. We affirm.

Werner's stepson is Leonard Dyer, born May 5, 1975. At all times material here, Dyer lived at Werner's residence in Aberdeen. Aberdeen is in Grays Harbor County.

On January 21, 1993, a deputy prosecutor in Pierce County charged Dyer with felony assault committed in Pierce County. The deputy prosecutor filed the charge in the adult division of the Pierce County Superior Court. He also prepared and proposed an arrest warrant that showed on its face, in capital letters, Dyer's date of birth. Dyer was then seventeen years old, and the juvenile division of the court had not declined jurisdiction. A judge of the adult division ordered that the warrant issue, and it was forwarded to Aberdeen for service.

On February 12, 1993, at about 6:30 A.M., uniformed Aberdeen police officers went to Werner's residence to serve the warrant. Dyer answered the door and was immediately arrested. Being in his underwear, he asked if he could get dressed before going to jail. The officers agreed and followed him into the house.

Inside, the officers smelled the odor of marijuana and surmised that a marijuana grow was in progress. They had not smelled the odor before entering, and they had not previously been suspicious about the residence.

The officers chose not to investigate further at that time. Rather, they allowed Dyer to get dressed and took him to jail.

An hour and a half later, one of the officers returned to the house and knocked. Werner answered the door. The officer asked to "look through his house to satisfy my curiosity that I believed he had a marijuana grow in his home."[1] Werner did not reply. The officer said he could attempt to obtain a search warrant, and Werner responded, "Get a warrant."[2]

The officer returned to his patrol car and began to drive away. As he did, he saw Werner get into a van and back it from the street into the driveway of the residence. The officer drove around the block and parked where Werner could not observe him. From his new vantage point, he saw Werner make several hurried trips from the house to the van, carrying objects the officer was too far away to identify. The officer suspected the objects were marijuana plants, based on what he had smelled while in the house earlier.

The officer left his patrol car and approached the residence on foot. As he went nearer, he may have seen, in the van, marijuana plants or boxes containing marijuana plants. His later testimony was not clear, however, and the trial court found:

---

[1] Report of Proceedings at 9-10.

[2] Report of Proceedings at 9-10.

There is a factual dispute between the testimony of [the officer] and the testimony of the defendant as to whether or not objects carried out of the residence . . . by the defendant after the second visit of [the officer] were able to be identified as marijuana plants. [The officer] testified he was able to observe potted marijuana plants being taken from the front door of the house and placed in the back of the van, [and] that he was able to observe this from 30 to 50 feet away. The defendant testified that any objects that he removed from his house were removed inside a box with a lid closed and that there was no way anyone could have observed what the objects were inside the box. In listening to the testimony of the parties, the court had a factual problem which it was unable to resolve . . . in favor of the plaintiff. The court is unable to find that the officer could have identified the plants as marijuana plants without the knowledge he had from having been inside the residence. There were many impediments to him observing the plants and the court is unable to find that he could have identified the plants from 30 to 50 feet away without the prior knowledge that there were marijuana plants in the house and without the prior knowledge that the defendant had a good reason to move the marijuana out of the house at that particular time.[3]

Neither party assails this finding.

As the officer approached the house, a taxi pulled up and Dyer's mother got out. The officer told her that he needed to speak with Werner, and she entered the house. Werner came out a moment later, threw his hands in the air, and said, "You guys got me, I give up."[4] The officer then asked if there were more marijuana plants inside. Werner said yes, and that officers could search if they wanted to. He signed a consent-to-search form, and officers soon found a marijuana grow operation.

Still on February 12, the deputy prosecutor back in Pierce County moved to dismiss the charge against Dyer without prejudice. The motion stated: "[T]he defendant is

---

[3]Clerk's Papers at 34-35.

[4]Report of Proceedings at 14.

a juvenile and, therefore, this court does [n]ot have jurisdiction over him. I am referring this case to juvenile court."[5] A judge of the adult division granted the motion and quashed the arrest warrant.

Four days later, on February 16, 1993, a deputy prosecutor in Grays Harbor County charged Werner with manufacture of marijuana and possession of marijuana with intent to deliver. Werner then filed a motion to suppress. After a hearing, the trial court ruled that the Pierce County warrant had been issued without jurisdiction; that the Aberdeen officers had violated Werner's Fourth Amendment rights when they entered Werner's home to arrest Dyer; that the unlawful entry "tainted" the officers' subsequent actions, as well as Werner's consent to search; and that the motion to suppress should be granted. The trial court granted the motion to suppress and dismissed the charges for lack of evidence.

The State now appeals, contending that the trial court erred by granting the motion to suppress. The briefs argue both the Fourth Amendment and Article I, § 7 of the Washington Constitution. Because the Fourth Amendment requires suppression, we do not reach Article I, § 7.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ In discussing this amendment, the United States Supreme Court has said that "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule

---

[5]Clerk's Papers at 11.

were violated by police conduct.' "[6] Following this method of analysis, we ask two questions: (1) Were Werner's Fourth Amendment rights violated when the police entered his house to arrest Dyer, and, if so, (2) should the violation be remedied by applying the exclusionary rule?

## I

■ Generally, the Fourth Amendment prohibits officers from entering a home without valid warrant, valid consent, or other valid justification.[7] The only justification asserted here is the arrest warrant for Dyer; the officers did not seek or obtain Dyer's consent to enter,[8] nor did they make a judgment of their own regarding probable cause or exigent circumstances. Thus, if the arrest warrant for Dyer was invalid, the entry into Werner's house was without justification, and Werner's Fourth Amendment rights were violated.[9]

■■ According to Werner, the arrest warrant for Dyer was invalid because the adult division of the Pierce County Superior Court lacked jurisdiction to issue it. We agree.

In January 1993, when the warrant for Dyer was issued, RCW 13.04.030 provided:

> The juvenile courts in the several counties of this state, shall have *exclusive* original jurisdiction over all proceedings:
> . . .
>
> (5) Relating to juveniles alleged or found to have committed offenses, traffic infractions, or violations as provided in RCW 13.40.020 through 13.40.230, as now or hereafter amended, unless:

---

[6]*United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed. 2d 677, *reh'g denied*, 468 U.S. 1250 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 223, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)); *see Arizona v. Evans*, 514 U.S. 1, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995).

[7]*Payton v. New York*, 445 U.S. 573, 576, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

[8]Neither party argues that Dyer consented to the entry, and the trial court did not find that he did.

[9]*See State v. Canady*, 116 Wn.2d 853, 809 P.2d 203 (1991).

(a) The juvenile court transfers jurisdiction of a particular juvenile to adult criminal court pursuant to RCW 13.40.110 . . . .

Laws of 1988, ch. 14, § 1 (emphasis added). Other statutes provided that a juvenile is any person under eighteen not previously remanded to adult court,[10] and that a juvenile offense is an act that would be a crime if committed by an adult.[11]

As can be seen, RCW 13.04.030 unambiguously vests the juvenile division of a superior court, informally known as the juvenile court, with "exclusive" original jurisdiction over a juvenile, unless and until the juvenile division properly declines jurisdiction.[12] A necessary corollary is that the adult division lacks jurisdiction over a juvenile, unless and until the juvenile division properly declines jurisdiction.[13] Dyer was seventeen when the adult division issued the warrant at issue here, and the juvenile division had not declined jurisdiction over him. Thus, the adult division lacked jurisdiction, and the warrant it issued was invalid.

The State argues that the adult division had jurisdiction due to *In re Dillenburg v. Maxwell*, 70 Wn.2d 331, 413 P.2d 940, 422 P.2d 783 (1966), *cert. denied*, 386 U.S. 998 (1967). In that case, the adult division of a superior court tried Dillenburg for a felony, even though he was sixteen and had not been remanded by a juvenile court. The statute in effect at the time, a prior version of RCW 13.04.030, stated in pertinent part:

The superior courts in the several counties of this state shall have original jurisdiction in all cases coming within the terms of this chapter. . . . A special session to be designated as the "juvenile court session" shall be provided for the hear-

---

[10]RCW 13.04.011(1), RCW 13.40.020(11).

[11]RCW 13.40.020(15).

[12]*State v. Pritchard*, 79 Wn. App. 14, 20, 900 P.2d 560, 563 (1995).

[13]*Pritchard*, 79 Wn. App. at 20.

ing of such cases . . ., and the court may, for convenience, be called the "juvenile court."

Former RCW 13.04.030, Laws of 1988, ch. 14, § 1.

The *Dillenburg* court issued two opinions. The first stated:

> The matter of the trial of a juvenile under 18 years of age as an adult in the superior court on a felony charge is not a case over which that court has original jurisdiction. The superior court as such has no jurisdiction to try such juvenile offender on a felony charge unless and until the conditions precedent prescribed in RCW 13.04.120 [the statute allowing remand to adult court] have been complied with.

*Dillenburg*, 70 Wn.2d at 340. Thus, Dillenburg had been tried without jurisdiction, and he was entitled to a new trial.

The second opinion altered the first. It said:

> [T]he statute did not divest, nor subtract from, the general jurisdiction of the superior courts, and it did not purport to vest "exclusive jurisdiction" over dependent or delinquent children in any other forum or court. At most, the statute . . . undertakes to distribute and assign a phase of the business of the superior court . . . .

*Dillenburg*, 70 Wn.2d at 352. Thus, the court said in essence that the juvenile and adult courts had concurrent original jurisdiction; that a new trial was not necessarily required; and that the trial court should determine whether a lawful remand hearing would have resulted in Dillenburg's transfer to adult court. If so, any error was harmless, and Dillenburg's adult court conviction could stand. If not, Dillenburg was entitled to a new trial in either juvenile or adult court, depending on his age at the time of trial.

The 1977 Legislature rewrote the statutory language

construed in *Dillenburg*.[14] In part, it did this by inserting the word "exclusive" before the words "original jurisdiction." Its efforts led to the January 1993 version of RCW 13.04.030, quoted above.

In addition, the 1981 Legislature enacted RCW 13.04.450. That statute provides:

> The provisions of chapters 13.04 and 13.40 RCW, as now or hereafter amended, shall be the exclusive authority for the adjudication and disposition of juvenile offenders except where otherwise expressly provided.

These 1977 and 1981 enactments clearly state that the juvenile division of a superior court has *exclusive* original jurisdiction over nondeclined juveniles. As a necessary corollary, they abrogate the concept, espoused in the second *Dillenburg* opinion, that the adult and juvenile divisions of a superior court have concurrent original jurisdiction over nondeclined juveniles. Today then, contrary to the second *Dillenburg* opinion, RCW 13.04.030 *does* provide the juvenile division of a superior court "with exclusive original jurisdiction over, *inter alia*, all proceedings '[r]elating to juveniles alleged or found to have committed offenses . . .'."[15]

These conclusions are consistent with the recent case of *Pritchard*, 79 Wn. App. 14, 20, 900 P.2d 560, 563 (1995), in which we mentioned two relationships pertinent here: (1) the organizational or administrative relationship between the adult and juvenile divisions of a superior court, and (2) the jurisdictional relationship between those same divisions. With respect to the *organizational* relationship, we said that under the statute in effect when *Dillenburg* was decided, juvenile court was a "session" of the superior court; that under the statute now in effect, juvenile court is a "division" of the superior court; that the distinction is one without difference; and that "juve-

---

[14]Laws of 1977, 1st Ex. Sess., ch. 291, § 4.

[15]*State v. Calderon*, 102 Wn.2d 348, 351, 684 P.2d 1293 (1984) (quoting RCW 13.04.030(6)).

nile court is still a part of superior court."[16] With respect to the *jurisdictional* relationship, we said, contrary to the second *Dillenburg* opinion, that the juvenile division of a superior court presently has exclusive jurisdiction over nonremanded juveniles, and that the adult division of the superior court acquires such jurisdiction only when the juvenile division properly transfers it.[17] We use all these propositions in this case.

■ In addition to arguing that the adult court had jurisdiction due to *Dillenburg*, the State argues that the adult court had jurisdiction due to Article IV, § 6 of the Washington Constitution.[18] Although that section gives the superior court original jurisdiction over certain specified kinds of cases, it does not prohibit the Legislature from assigning exclusive jurisdiction to a particular division of the superior court. Thus, Article IV, § 6 does not alter the foregoing analysis of juvenile court jurisdiction.

Concluding this part of our discussion, we hold that the adult division of the Pierce County Superior Court lacked

---

[16]*Pritchard*, 79 Wn. App. at 18.

[17]*Pritchard*, 79 Wn. App. at 20.

[18]In January 1993, Article IV, § 6 provided in pertinent part:

The superior court shall have original jurisdiction in all cases in equity and in all cases at law which involve the title or possession of real property, or the legality of any tax, impost, assessment, toll, or municipal fine, and in all other cases in which the demand or the value of the property in controversy amounts to three thousand dollars or as otherwise determined by law, or a lesser sum in excess of the jurisdiction granted to justices of the peace and other inferior courts, and in all criminal cases amounting to felony, and in all cases of misdemeanor not otherwise provided for by law; of actions of forcible entry and detainer; of proceedings in insolvency; of actions to prevent or abate a nuisance; of all matters of probate, of divorce, and for annulment of marriage; and for such special cases and proceedings as are not otherwise provided for. The superior court shall also have original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court . . . .

Juvenile offenses are neither felonies nor misdemeanors. RCW 13.04.240; *In re Frederick*, 93 Wn.2d 28, 29, 604 P.2d 953 (1980) (juvenile offenses not felonies); *State v. Matthews*, 6 Wn. App. 201, 203, 492 P.2d 1076 (1971) (juvenile conviction not equivalent to conviction for crime), *review denied*, 80 Wn.2d 1006 (1972); *State v. Wilson*, 1 Wn. App. 1001, 1004, 465 P.2d 413, *review denied*, 78 Wn.2d 994 (1970) (same).

jurisdiction to issue an arrest warrant for a nondeclined juvenile. As a result, it issued an invalid warrant for Dyer, the police entered Werner's home without justification, and Werner's Fourth Amendment rights were violated.

## II

We turn next to whether the violation of Werner's rights should be remedied by applying the exclusionary rule. The State answers no, for two reasons. First, it says the Aberdeen officers acted in "good faith reliance upon a facially valid warrant of arrest."[19] Second, it says the initial entry without justification was so attenuated from the later discovery of marijuana that any taint was removed. In short, the State relies on (a) the "good faith" exception and (b) the "attenuation" doctrine.

## A

The United States Supreme Court has adopted a "good faith" exception to the exclusionary rule.[20] The Washington Supreme Court has not.[21] After analyzing federal constitutional law, we conclude that the federal exclusionary rule applies here, and that the federal good faith exception does not. Thus, we do not reach whether state law gives Werner greater rights than federal law.

According to the United States Supreme Court, the primary purpose of the exclusionary rule is to deter police misconduct.[22] Generally, the rule applies to police and other members of the "the law enforcement team,"[23]

---

[19]Br. of Appellant at 17.

[20]*Leon*, 468 U.S. at 918; *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984); *Illinois v. Krull*, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987); *Evans*, 115 S. Ct. at 1191-92.

[21]*State v. Riley*, 121 Wn.2d 22, 30, 846 P.2d 1365 (1993); *State v. Canady*, 116 Wn.2d at 857-58.

[22]*Leon*, 468 U.S. at 916; *Krull*, 380 U.S. at 347, 350.

[23]*Leon*, 468 U.S. at 917, 923 n.24.

but not to judges,[24] court clerks,[25] or state legislatures.[26] Even in situations involving "the law enforcement team," however, the rule does not apply if all members of the team relied in an objectively reasonable way on a warrant later found to be invalid.[27] The reason, according to the United States Supreme Court, is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."[28]

In short, where the officer's conduct is objectively reasonable,

> excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.

---

[24]*Leon*, 468 U.S. at 918. According to the *Leon* Court, "there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *Leon*, 468 U.S. at 916. Moreover, there is no basis

> for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate. . . . Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests.

*Leon*, 468 U.S. at 916-17; *see also Krull*, 480 U.S. at 348. Disagreeing, some state courts hold on state constitutional grounds that the purpose of the exclusionary rule is not just to promote compliance with law by the police, but rather to promote compliance with law by all who participate in the warrant-issuing process. According to these courts, the rule applies to judges and magistrates as well as to police. *E.g., State v. Marsala*, 216 Conn. 150, 579 A.2d 58 (1990); *State v. Guzman*, 122 Idaho 981, 842 P.2d 660 (1992).

[25]*Evans*, 115 S. Ct. at 1193-94.

[26]*Krull*, 480 U.S. at 352-53.

[27]*Leon*, 468 U.S. at 918; *Sheppard*, 468 U.S. at 982.

[28]*Leon*, 468 U.S. at 919.

This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.[29]

As we understand these cases, at least two requirements must be met in order for the federal "good faith" exception to apply. First, each officer's reliance on the warrant must be objectively reasonable.[30] This standard requires that members of the law enforcement team be reasonably trained and "have a reasonable knowledge of what the law prohibits."[31] It is not met "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" if "the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*;"[32] if the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;"[33] or if the warrant was "so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be

[29]*Leon*, 468 U.S. at 919-21. (Citations omitted.)

[30]*Leon*, 468 U.S. at 922 n.23; *Sheppard*, 468 U.S. at 988, 990; *Krull*, 480 U.S. at 355; *Evans*, 115 S. Ct. at 1194.

[31]*Leon*, 468 U.S. at 920 n.20.

[32]*Leon*, 468 U.S. at 923. In *Lo-Ji*, the magistrate so overstepped his role that "he was not acting as a judicial officer but as an adjunct law enforcement officer." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979); *see also Leon*, 468 U.S. at 914.

[33]*Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

valid."[34] In each of these situations, an objectively reasonable officer would not rely on the warrant, and "subjective good faith" is of no consequence.[35]

Second, the entire "law enforcement team" must have acted with objective reasonableness. As the Court has said:

> It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search. See *Whiteley v. Warden*, 401 U. S. 560, 568[, 91 S. Ct. 1031, 28 L. Ed. 2d 306] (1971).

*Leon*, 468 U.S. at 923 n.24.

*Leon* illustrates. There, an officer of the Burbank, California, Police Department prepared an extensive application for a search warrant. He had it reviewed by several deputy district attorneys, who apparently thought there was probable cause. He then presented the application to a state superior court judge, who found probable cause and issued a facially valid search warrant. Drugs were found in the ensuing search, and the defendants were charged in federal court. The defendants then filed a motion to suppress, which the federal judge granted. "[W]hile recognizing that the case was a close one," the federal judge "concluded that the affidavit was insufficient to establish probable cause."[36]

As can be seen, *Leon* involved a difference of opinion among legal professionals concerning the existence of probable cause in a close case. It did not involve intentional or negligent misconduct on anyone's part. Accordingly,

---

[34]*Leon*, 468 U.S. at 923.

[35]*Leon*, 468 U.S. at 920 n.20.

[36]*Leon*, 468 U.S. at 903.

the United States Supreme Court ruled on appeal that the entire law enforcement team had acted properly; that applying the exclusionary rule would not deter improper law enforcement conduct; and that the order of suppression should be reversed.

In the case at bar, it is clear that the Aberdeen police officers acted with objective reasonableness when they entered Werner's home in reliance on a facially valid warrant for Dyer. They were not required to question the jurisdiction of the adult court, even though Dyer's date of birth appeared on the face of the warrant; as far as they knew or had reason to know, Dyer had previously been transferred to adult court. *See* RCW 13.40.020(14).

Two questions remain. (1) Was the deputy prosecutor who procured the invalid warrant a member of the law enforcement team? (2) If so, was the deputy prosecutor acting with objective reasonableness when he sought and obtained, from the adult division of the Pierce County Superior Court, the arrest warrant for Dyer?

■ The deputy prosecutor was a member of the law enforcement team. He was engaged, with the help of the Aberdeen police, "in the often competitive enterprise of ferreting out crime."[37] Moreover, he was a member of the executive branch, as opposed to the judicial or legislative branch; thus, he was not like the judge in *Leon*, the court clerk in *Evans*, or the state legislature in *Krull*.

The deputy prosecutor did not act with objective reasonableness when he obtained an arrest warrant for Dyer from the adult division of the Pierce County Superior Court. Either he failed to perceive the adult court's lack of jurisdiction over a nondeclined juvenile, or he failed to note Dyer's date of birth as shown in capital letters on the face of the warrant form prepared by his office. In either event, his conduct was not that of an objectively reasonable prosecutor. Nor was it taken in objectively reason-

---

[37]*See Evans,* 115 S. Ct. at 1193; *Johnson v. United States,* 333 U.S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948).

able reliance on the decision of a judge, court clerk, or state legislature, as in *Leon, Evans,* or *Krull.* Thus, his conduct is imputed to the law enforcement team;[38] the federal good faith exception does not apply in this case; and the federal exclusionary rule does.

## B

■ To apply the attenuation doctrine, we must ask whether the evidence would have been discovered even without the Fourth Amendment violation.[39] This question is dispositive when answered yes,[40] but nondispositive when answered no.[41] If it is answered no, we also must ask whether the evidence was discovered "by means sufficiently distinguishable to be purged of the primary taint," and not by exploitation of the Fourth Amendment violation.[42]

The answer to our first question is no. Before February 12, the police had no suspicions about Werner or his house. While speaking with Dyer at the front door, they still had no suspicions. But for their entry into Werner's house, which was a Fourth Amendment violation for reasons

---

[38]*Leon,* 468 U.S. at 923 n.24.

[39]*State v. Chapin,* 75 Wn. App. 460, 463, 879 P.2d 300 (1994), *review denied,* 125 Wn.2d 1024 (1995); *State v. Aranguren,* 42 Wn. App. 452, 457, 711 P.2d 1096 (1985). The same question can be translated into negative terms by asking whether the evidence would not have been discovered "but for" the Fourth Amendment violation.

[40]When answered yes, this question is the same as, or at least similar to, the inevitable discovery rule. *See Nix v. Williams,* 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), *cert. denied,* 471 U.S. 1138 (1985); *State v. Warner,* 125 Wn.2d 876, 889, 889 P.2d 479 (1995).

[41]*State v. Rodriguez,* 32 Wn. App. 758, 762, 650 P.2d 225, *review denied,* 98 Wn.2d 1005 (1982).

[42]*Wong Sun v. United States,* 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *see also Taylor v. Alabama,* 457 U.S. 687, 690, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 217, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 602, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); *State v. Byers,* 88 Wn.2d 1, 8, 559 P.2d 1334 (1977); *State v. Gonzales,* 46 Wn. App. 388, 397-98, 731 P.2d 1101 (1986); *State v. Jensen,* 44 Wn. App. 485, 489-90, 723 P.2d 443, *review denied,* 107 Wn.2d 1012 (1986).

discussed above, the marijuana would never have been discovered.

The answer to our second question is also no. Because of what the officers perceived while in the house, one of them went back, an hour and a half later, to confront Werner. Immediately following that confrontation, Werner began loading objects into his van. According to the trial court's unchallenged finding, the officer would not have known those objects were marijuana "without the prior knowledge that there were marijuana plants in the house and without the prior knowledge that the defendant had a good reason to move the marijuana out of the house at that particular time."[43] The officer's knowledge that the plants were marijuana led directly to a second confrontation with Werner, in which Werner essentially confessed and submitted to a search. Throughout these events, the officers were exploiting, albeit in subjective good faith, the information acquired while they were in the house to arrest Dyer. It follows that the attenuation doctrine does not apply, and that the exclusionary rule does.

Summarizing, we hold that the Fourth Amendment was violated when the officers entered Werner's home with no justification other than a warrant issued by a court that lacked jurisdiction. We also hold, as a matter of federal constitutional law, that the federal exclusionary rule applies. We conclude that the trial court did not err by granting the motion to suppress.

The superior court's judgment is affirmed.

SEINFELD, C.J., and WIGGINS, J., concur.

Review granted at 129 Wn.2d 1005 (1996).

---

[43]Clerk's Papers at 35.