[No. 37267-3-II. Division Two. January 4, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. JACK T. HYDER, *Appellant.*

*Lenell R. Nussbaum*, for appellant.

*H. Steward Menefee, Prosecuting Attorney*, and *Katherine L. Svoboda, Deputy*, for respondent.

¶1 LEACH, J. — Jack T. Hyder appeals his convictions for second degree child molestation and second degree incest. He challenges the admission of his therapists' statements and the procedures used by the State to become aware of these statements. He also claims that the trial court improperly seated a juror and erred in imposing an exceptional sentence.

¶2 Because a mandatory reporting statute[1] makes inapplicable any therapist-client privilege and the investigating officer properly employed a search warrant to obtain the therapists' records, the trial court did not err in admitting the therapists' statements. Hyder waived any objection to the manner in which the challenged juror was seated. Because the issue of whether the statutory aggravating factors found by the jury are substantial and compelling is not a jury question, the trial court appropriately decided this issue in imposing an exceptional sentence. Hyder's judgment and sentence leaves unclear whether the combined terms of incarceration and community custody exceed the statutory maximum. Therefore, we remand for clarification of the community custody term and otherwise affirm Hyder's convictions and sentence.

## FACTS

¶3 Hyder married Judy D'Angelo in 1982. Their marriage produced 11 children, 2 of whom passed away before the beginning of this case. Evelyn Hyder, born on December 28, 1984, is the second oldest of Hyder's children and his

---

[1] RCW 26.44.030.

oldest daughter. The children were all home schooled by their parents.

¶4 The children were active in church and had music lessons. But for the most part, they were kept at home and isolated from other people. The children were expected to complete daily chores. Their father, Hyder, was the only one who worked outside the home. He was a veterinarian and maintained his own practice. Hyder was a strict disciplinarian and could be physically violent when he was angry. He conducted room inspections every morning. On occasion Hyder beat the children with a belt for small infractions, e.g., a pillow left too flat on a bed or the girls' failure to oversee dinner preparation to his standards. These beatings sometimes produced welts and bruises up and down the children's bodies.

¶5 Evelyn testified at trial that when she was about 11 years old, Hyder began coming into her room at night and taking her into his library. Hyder would lie with Evelyn on a guest bed in the library. Naked underneath his robe, he would make Evelyn stroke his penis. He would also put his mouth on her breasts and bite them.

¶6 This sexual contact occurred frequently and then tapered off. But when Evelyn turned 13, the sexual contact became more frequent again. Hyder would kiss, push, and play with Evelyn's breasts until they were sore. He also touched inside her vagina and rubbed his naked body against hers. Evelyn described an incident when she was 15, where her father "started with the kissing the breasts and touching inside [Evelyn's] vagina, having [her] massage his penis," and then picked her up and put her on his lap so they were facing each other. He rubbed his penis against Evelyn's genitals, and she could feel the head of his penis against her vagina.

¶7 Evelyn's siblings observed contact they believed was inappropriate between her and her father. This contact included observing Hyder kissing Evelyn repeatedly up and

down her neck. One time Evelyn's older brother, Luke, while studying at his desk in a nearby room, also heard kissing for approximately eight minutes coming from Hyder's office. When Luke walked into his father's office, he saw Hyder kissing Evelyn. Evelyn's sister Rosey also observed Hyder sliding his hand up Evelyn's shirt and rubbing Evelyn's breasts while he told the other children to go outside and play.[2]

¶8 Hyder told Evelyn that she would ruin the family if she told anyone about his conduct with her. When Evelyn was about 14, she finally confided in a priest during confession. The priest gave her penances but took no further action.[3] At another confession, a different priest, not realizing she was home schooled, made her promise to tell a teacher about her father's sexual abuse. When she was 17, Evelyn confided in yet another priest, but he instructed her that telling anyone else would ruin her family. Evelyn testified that as she grew older she continued to comply with her father's sexual demands because if she "didn't want to massage his penis or anything like that," he would become violently angry, finding trivial reasons to beat her and the other children with his belt during the following day.[4]

¶9 Evelyn's mother, Judy, testified for the defense, stating that she frequently woke up at night and always saw Hyder beside her, soundly sleeping. But Evelyn testified that her mother had discovered Evelyn and her father late one night in his study and saw Hyder molesting Evelyn, and Evelyn knew that her mother knew what was going on. Rosey also testified that when she and Evelyn tried to tell

---

[2] Rosey also testified that Hyder had improper sexual contact with her, but the jury acquitted Hyder on the charges regarding Rosey and that portion of Rosey's testimony is not discussed further.

[3] Evelyn's priest testified that around 1998, during multiple occasions at confession, Evelyn said that her father had touched her inappropriately.

[4] Evelyn testified, "My sister would have bruises all over her body because I didn't, you know, I didn't comply." Evelyn's mother admitted that she sometimes had the children wear long clothing to cover up the marks left from their father's belt.

their mother about how Hyder kept them both up late at night "kissing" them, she would not help.[5] Judy's sister, Donna D'Angelo, testified that while Judy and the children were in New York, Judy's behavior indicated that her allegiance was to Hyder and not to the children.

¶10 In June 2002, as Luke was preparing to leave for West Point, Evelyn finally told him about Hyder's conduct. Luke confronted his father, who became angry and told Evelyn that his conduct was her fault. The next day Evelyn's mother left to travel with Luke to West Point as planned. Hyder drove them to the airport in Seattle. While Hyder drove to the airport, Evelyn called her aunt, Donna D'Angelo, in New York and confided in her about the molestation.

¶11 When Judy arrived in New York, Donna told her about Evelyn's telephone call. Donna convinced Judy to report the matter to Child Protective Services (CPS) and to move the children to New York. With the help of family and friends, Donna and Judy did so. Judy testified that she told Hyder he had to seek treatment and admit the molestation before the family could be reunited.

¶12 In the fall of 2002, Hyder sought treatment from a sex offense treatment provider, Trudy Hoy. Hyder admitted to her that his repeated sexual contacts with Evelyn began when she was 12 years old. Hyder also told her that he was concerned about his behavior toward Rosey, that he did not want his behavior to escalate, and that he wanted to be able to stop his behavior and not sexually offend Rosey the way he had Evelyn.

¶13 CPS referred the reported abuse to the Grays Harbor County Sheriff's Office in 2002, but the Hyder children, who were then in New York with their mother, did not come forward with statements. Eventually, Evelyn, Rosey, and Luke provided statements to the Grays Harbor County Sheriff's Office in 2003 and 2004 that culminated in a report to the prosecutor's office for charging.

---

[5] Rosey testified, "We tried to tell her it was happening. She would just — she'd like pull back and be like, Okay, I'll handle it. And we'd never hear about it again."

¶14 On December 21, 2005, the State charged Hyder with seven counts as follows: first degree child rape regarding Rosey (count I), first degree child molestation regarding Rosey (count II), first degree child rape regarding Evelyn (count III), first degree child molestation regarding Evelyn (count IV), second degree child rape regarding Evelyn (count V), second degree child molestation regarding Evelyn (count VI), and second degree incest regarding Evelyn (count VII). The State alleged aggravating factors to support an exceptional sentence above the standard range: the offense was part of an ongoing pattern of sexual abuse of the same victim under the age of 18 years, manifested by multiple incidents over a prolonged period of time, RCW 9.94A.535(3)(g), and the defendant used his position of trust or confidence to facilitate the commission of the current offense, RCW 9.94A.535(3)(n). When these charges were filed, the court ordered no contact between the Hyder children and their father.

¶15 In November 2006, Hyder moved to review the CPS file on Evelyn for evidence useful to the defense. Both parties agreed to the trial court's suggestion that both parties' counsel review copies of the CPS file instead of having the court conduct an in camera review. During that review, the parties discovered that Hyder's therapist had filed a report with CPS regarding Hyder's admitted abuse of Evelyn. Because this discovery was made on the eve of trial, the defense moved for a continuance, which the court granted.

¶16 The investigating detective on Hyder's case obtained a search warrant and executed a search at the therapist's office regarding Hyder's treatment records, and the State later called Hyder's therapist, Trudy Hoy, and her forensic evaluator, Ronald Yunck, as witnesses. Before trial, Hyder moved to suppress Hoy's and Yunck's testimony, but the trial court denied the motion.

¶17 Trial ultimately occurred in November 2007. Evelyn testified regarding Hyder's abuse as above described. Hoy and Yunck also testified about statements Hyder made to

them describing multiple incidents when he sexually abused Evelyn.[6] Judy testified that at first she believed Evelyn's allegations of sexual abuse by her father but later decided the allegations were "unbelievable" and "like something from a novel." At the close of evidence, the court directed a verdict of not guilty on counts III and IV, ruling there was insufficient evidence that Evelyn was abused before age 12.

¶18 The jury found Hyder not guilty of sexually abusing Rosey, counts I and II, and not guilty of sexual intercourse with Evelyn, count V. The jury found Hyder guilty of count VI, second degree child molestation of Evelyn, and count VII, second degree incest against Evelyn.[7] The jury responded "yes" on both special verdicts for each of the two guilty counts, finding that each offense was part of an ongoing pattern of sexual abuse of a person under 18, as manifested by multiple incidents over a prolonged period of time, and that Hyder used his position of trust to facilitate the commission of the offenses.

¶19 The trial court imposed exceptional consecutive sentences. Hyder's appeal followed.

## ANALYSIS

### I. Admission of Therapists' Testimony

¶20 Hyder contends that the trial court erred by not suppressing the testimony of Hoy and Yunck. Although Hyder raises several arguments challenging the admission of this testimony, his primary contention is that his statements made to Hoy and her associate in the context of

---

[6] Hyder admitted in interviews that he had had sexual contact with Evelyn, including putting his hand on her breast, his mouth on her breast, his hand on her vagina, his fingers in her vagina; rubbing his penis on her vagina; placing his penis between her legs; placing her hand on his penis; and requiring her to masturbate him; that such contacts occurred from two to five times a week; and that they occurred from the time Evelyn was 12 through 17 years old and he was 37 to 42 years old (1996 through 2002).

[7] *See* RCW 9A.44.086; RCW 9A.64.020(2).

therapy are privileged and, absent his waiver, should not have been admitted. We disagree.

¶21 The admission of evidence is within the sound discretion of the trial court and will not be reversed absent a manifest abuse of that discretion.[8] A trial court abuses its discretion when the reason for its decision is manifestly unreasonable or based upon untenable grounds.[9] Restated, a trial court abuses its discretion when it adopts a view no reasonable person would take.[10] Hyder contends that his statements to Hoy and Yunck are protected by the therapist-patient privilege, RCW 18.83.110, which provides in part,

> Confidential communications between a client and a psychologist shall be privileged against compulsory disclosure to the same extent and subject to the same conditions as confidential communications between attorney and client.[11]

He argues that the privilege survives the mandatory reporting provisions of RCW 26.44.030 and bars his therapists' testimony absent his waiver.[12]

¶22 In *State v. Warner*,[13] our Supreme Court addressed the relationship between RCW 26.44.030 and RCW 18-.83.110. The *Warner* court noted in part that "privileges are generally disfavored in criminal cases" and that this policy "is especially strong in child sex abuse cases."[14] The

---

[8] *State v. Markle*, 118 Wn.2d 424, 438, 823 P.2d 1101 (1992).

[9] *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 77, 684 P.2d 692 (1984).

[10] *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997).

[11] Hyder also cites to RCW 5.60.060(2)(a), which provides, "An attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment."

[12] RCW 26.44.030(1)(a) requires any practitioner or psychologist who has "reasonable cause to believe that a child has suffered abuse or neglect . . . shall report such incident, or cause a report to be made, to the proper law enforcement agency."

[13] 125 Wn.2d 876, 889 P.2d 479 (1995).

[14] *Warner*, 125 Wn.2d at 892-93 n.8.

*Warner* court held that RCW 26.44.030 provided a "clear exception" to the psychologist-client privilege and that "RCW 26.44.030 . . . trumps the statutory privilege."[15] The court explained that " '[i]t is evident that . . . the legislature has attached greater importance to the reporting of incidents of child abuse and the prosecution of perpetrators than to counseling and treatment of persons whose mental or emotional problems cause them to inflict such abuse.' "[16] *Warner* held that since the legislature has spoken on this issue, "it is not the court's role to question that legislative judgment."[17]

¶23 Later, Division Three applied *Warner* in *State v. Ackerman*[18] to reject the same argument that Hyder makes here. The defendant in *Ackerman* argued that his sex offender treatment provider should not have been permitted to testify because the defendant had not waived the counselor-patient privilege.[19] As here, the therapist testified about statements the defendant made during therapy describing defendant's abuse of his child victim.[20] The *Ackerman* court acknowledged the privilege but held that under *Warner*, "RCW 26.44.030 . . . takes precedence over the counselor-patient privilege" and concluded that the trial court did not err in admitting the testimony of the defendant's therapist.[21]

---

[15] *Warner*, 125 Wn.2d at 892.

[16] *Warner*, 125 Wn.2d at 892 (quoting *State v. Fagalde*, 85 Wn.2d 730, 736, 539 P.2d 86 (1975)).

[17] *Warner*, 125 Wn.2d at 892; *cf. C.J.C. v. Corp. of the Catholic Bishop*, 138 Wn.2d 699, 717, 985 P.2d 262 (1999) ("Where childhood sexual abuse is at issue, even long established privileges do not apply."). Notably, *C.J.C.* cited *Fagalde* for the proposition that the "client-psychologist privilege does not apply to *any judicial proceeding* regarding a child's injury, neglect, or sexual abuse." *C.J.C.*, 138 Wn.2d at 717 (emphasis added) (citing *Fagalde*, 85 Wn.2d at 735-37).

[18] 90 Wn. App. 477, 485-87, 953 P.2d 816 (1998).

[19] *Ackerman*, 90 Wn. App. at 485-86.

[20] *Ackerman*, 90 Wn. App. at 486 n.4.

[21] *Ackerman*, 90 Wn. App. at 486-87.

¶24 Division Three also noted that the defendant had waived the counselor-patient privilege in any event by signing releases allowing his victim's therapist, his attorney, and CPS access to his counseling file.[22] Hyder contends that this distinguishes *Ackerman*. But the *Ackerman* decision acknowledges alternative bases for affirming the trial court's decision to admit the therapist's testimony—defendant's waiver of the privilege by signing releases or as compelled by *Warner*.[23] Despite *Warner* and *Ackerman*, Hyder maintains that the therapist-patient privilege is not limited by the noted mandatory reporting requirement. He cites *State v. Glenn*[24] and *King v. Riveland*[25] as authority for his contention that the trial court erred by admitting his therapist's testimony. But neither case supports his position.

¶25 *Glenn* addressed the particulars of the clergy-penitent privilege and whether the defendant's statements to a church elder, who was "ordained," qualified as a confidential "confession" under church doctrine to which the noted privilege attached.[26] *King* addressed the continued efficacy of a confidentiality statement that inmates signed with the Department of Corrections (DOC) as a precondition for participation in a sex offender treatment program. DOC subsequently changed its policy. It revised the confidentiality statement's provisions to provide an inmate's entire treatment file to the prosecutor near the end of the inmate's incarceration period to assist the State in determining whether to seek civil commitment of the inmate as a sexually violent predator.[27] DOC considered its policy change retroactive to include all inmates in sex offender treatment. The *King* case addressed a class action suit by

---

[22] *Ackerman*, 90 Wn. App. at 486-87.

[23] *See Ackerman*, 90 Wn. App. at 486-87.

[24] 115 Wn. App. 540, 62 P.3d 921 (2003).

[25] 125 Wn.2d 500, 886 P.2d 160 (1994).

[26] *Glenn*, 115 Wn. App. at 547-48.

[27] *King*, 125 Wn.2d at 504.

those inmates who had signed the original (unrevised) confidentiality statement. The class's lawsuit sought to enjoin DOC from disclosing entire treatment files, relying on the provisions of the confidentiality statements which the inmates signed. Neither *Glenn* nor *King* provides Hyder with the support he seeks.

¶26 Hyder also challenges the procedures by which the State became aware of his therapists' statements. Citing *Pennsylvania v. Ritchie*,[28] he complains that the trial court erred by failing to conduct an in camera review of CPS files regarding Evelyn's abuse that Hyder requested. Hyder contends that the trial court's failure to conduct an in camera review prejudiced him because the procedure of mutual disclosure adopted by the trial court revealed to the State his therapist's mandatory report to CPS about his abuse of Evelyn, while an in camera review would not.

¶27 The State agrees that under *Ritchie* the trial court should have conducted an in camera review, but it contends that any error was harmless.[29] Despite Hyder's contentions to the contrary, the record shows that defense counsel agreed to the procedure proposed by the trial court of having both parties' counsel review copies of the CPS file.[30] Having agreed to that procedure in open court, Hyder

---

[28] 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987).

[29] In *Ritchie*, the Supreme Court held that the defendant charged with child abuse was entitled to have the trial court review the state youth services file to determine whether the file contained information that probably would have changed the outcome of defendant's trial. *Ritchie*, 480 U.S. at 58. The Court explained that defendant's right to discover exculpatory evidence does not include unsupervised authority to search through the youth services file in order to make a determination as to materiality of information contained therein. *Ritchie*, 480 U.S. at 59-60. The Court concluded that the interest of a defendant charged with child abuse, as well as that of the State in ensuring a fair trial, could be fully protected by requiring that the state youth services child abuse file be submitted only to the trial court for in camera review because allowing full disclosure of the file to defense counsel would sacrifice unnecessarily the *State's* compelling interest of protecting child abuse information contained therein. *Ritchie*, 480 U.S. at 60.

[30] Notably, the circumstance here is *not* that the trial court declined to conduct an in camera review of a confidential file and, as a result, defendant was denied access to material evidence favorable to the defense. *See, e.g., State v. Gregory*, 158 Wn.2d 759, 791-94, 147 P.3d 1201 (2006). As noted, Hyder's counsel was given full

cannot now challenge it. "The doctrine of invited error 'prohibits a party from setting up an error at trial and then complaining of it on appeal.' "[31]

¶28 Hyder next argues that the State's execution of a search warrant to obtain his medical records from his therapist was an abuse of process. Under the circumstances of this case, we disagree.

¶29 " 'Abuse of process' is the misuse or misapplication of the process, after the initiation of the legal proceeding, for an end other than that which the process was designed to accomplish."[32] Abuse of process is a tort, and the party asserting it must show both " '(1) the existence of an ulterior purpose to accomplish an object not within the proper scope of the process, and (2) an act in the use of legal process not proper in the regular prosecution of the proceedings.' "[33] Hyder has not made such showing.

¶30 Hyder does not challenge the validity of the search warrant. Instead, he contends that the warrant procedure was unavailable because other procedures available to the State to seek his medical records provide the exclusive means to do so, namely, court rule subpoena procedures and chapter 70.02 RCW, the Uniform Health Care Information Act (UHCIA). He notes that both of these procedures require notice to the adverse party. The applicable court rules require service of a subpoena upon the adverse party.[34] The UHCIA requires that an attorney seeking health care

access to the requested CPS file. Report of Proceedings (RP) (Nov. 21, 2006) at 45-48.

[31] *State v. Wakefield*, 130 Wn.2d 464, 475, 925 P.2d 183 (1996) (quoting *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 321, 893 P.2d 629 (1995)); *see also State v. Korum*, 157 Wn.2d 614, 646, 141 P.3d 13 (2006).

[32] *Saldivar v. Momah*, 145 Wn. App. 365, 388, 186 P.3d 1117 (2008), *review denied*, 165 Wn.2d 1049, 208 P.3d 555 (2009).

[33] *Saldivar*, 145 Wn. App. at 388 (quoting *Mark v. Williams*, 45 Wn. App. 182, 191, 724 P.2d 428 (1986)).

[34] CrR 4.8 provides that subpoenas in criminal cases shall be issued in the same manner as in civil cases. CR 45(b)(2) provides that a subpoena commanding production of documents and things "shall be served on each party" and such

information from a health care provider via a discovery request provide advance notice (at least 14 days) to the health care provider and the patient adequate to permit either to obtain a "protective order."[35] The health care provider cannot provide the requested information without the written consent of the patient unless the attorney has complied with the advance notice requirements.[36]

¶31 Hyder contends that the State employed a search warrant in order to avoid these notice provisions, but he cites no authority indicating that these alternate procedures preclude the State's use of a search warrant. The authority he does cite, *State v. White*[37] and *Wynn v. Earin*,[38] does not assist him. In *White*, Division One held that when the State issues a subpoena duces tecum to a third person, the State must serve notice of the subpoena on the adverse party, as required by the applicable court rules.[39] This unremarkable holding merely requires that a party follow all the requirements of the court rules when using compulsory process authorized by those rules.[40] Nothing in *White* prohibits the State from employing a different valid procedure for obtaining evidence.

¶32 In *Wynn*, our Supreme Court addressed the interplay between the UHCIA with the common law witness immunity rule. The court observed that RCW 70.02.060 "plainly contemplates that the Act applies when disclosure is sought during or in preparation for judicial proceedings."[41] Again, this is unremarkable because RCW

---

service "shall be made no fewer than five days prior to service of the subpoena on the person named therein."

[35] RCW 70.02.060(1).

[36] RCW 70.02.060(2).

[37] 126 Wn. App. 131, 107 P.3d 753 (2005).

[38] 163 Wn.2d 361, 181 P.3d 806 (2008).

[39] *White*, 126 Wn. App. at 136 (court rules require service of subpoenas duces tecum upon adverse parties in both criminal and civil cases).

[40] *See* CrR 4.8; CR 45(b)(2).

[41] *Wynn*, 163 Wn.2d at 372.

70.02.060 expressly addresses what procedures are required when an attorney makes discovery requests. Nothing in *Wynn* purports to limit the State to the UHCIA procedures when investigating an alleged crime.

■ ¶33 Hyder asserts that the State's use of a search warrant instead of the UHCIA procedures violated his Wash. Const. art. I, § 7 privacy right. He provides no explanation or case law support for this claim. Our Supreme Court has held that a search warrant and its accompanying issuance procedures provide an appropriate mechanism for protecting state constitutional privacy rights. In *State v. Miles*,[42] the court explained,

> Warrant application and issuance by a neutral magistrate limit governmental invasion into private affairs. In part, the warrant requirement[ ] ensures that some determination has been made which supports the scope of the invasion. The scope of the invasion is, in turn, limited to that authorized by the authority of law. The warrant process, or the opportunity to subject a subpoena to judicial review, also reduces mistaken intrusions.

The *Miles* court concluded that the banking records at issue were private affairs protected by Wash. Const. art. I, § 7. Accordingly, "[a] search of personal banking records *without a judicially issued warrant* or subpoena to the subject party violates article I, section 7."[43] The subpoena and UHCIA procedures referenced by Hyder permit, but do not require, the target or affected party of the information request to go before a judge to seek limitation of the information sought. In contrast, the search warrant employed here required the State to first go before a neutral magistrate and show probable cause of criminal activity as a prerequisite to obtaining a warrant. As noted, our Supreme Court has held that the search warrant issuance procedures adequately protect a defendant's privacy rights.

■ ¶34 Moreover, although the State employed a search warrant, and Hyder thus did not receive written advance

---

[42] 160 Wn.2d 236, 247, 156 P.3d 864 (2007) (citations omitted).

[43] *Miles*, 160 Wn.2d at 252 (emphasis added).

notice that the State sought to obtain information regarding his admissions of criminal conduct to his therapists, the record shows his awareness of the State's vigorous pursuit of information from his therapist. With the discovery of the referral in the CPS file, Hyder's counsel sought a continuance. At that hearing, the State noted the investigating detective's efforts to track down and communicate with Hyder's therapist in light of the newly discovered evidence. Defense counsel acknowledged that the report changed the landscape of the trial, that it was information that the State wanted to seek and develop, and that the defense would have to address it. In light of these acknowledgements, Hyder cannot now be heard to contend that he lacked notice that the State would be seeking such information.

¶35 Also, the purpose of the notice requirements in the court rules and the UHCIA is to permit the affected parties an opportunity to forestall use of the information.[44] Here, Hyder had a remedy. Before trial Hyder filed a motion in limine seeking to bar his therapists' testimony and all records pertaining to his statements. Although that motion was unsuccessful, it provided Hyder with an adequate parallel remedy. Hyder has failed to show that the State's purpose in using a warrant to gather evidence was outside a warrant's proper scope. He also has failed to show any prejudice when the records in issue describe events that are the subject of mandatory reporting.

¶36 In sum, for the reasons discussed above, we hold that the trial court did not abuse its discretion in admitting the testimony of Hoy and Yunck.

## II. Sworn Juror

¶37 Hyder initially argued that he should receive a new trial because a juror, who was unsworn for voir dire, was seated on the jury and participated in deliberations. Hyder now concedes that the juror in question, juror 25, was sworn

---

[44] *See* CR 45(c)(3) (providing for motion to quash or modify); RCW 70.02.060(1) (providing for protective order).

before voir dire questioning but outside his presence. In his reply brief he asserts for the first time that since juror 25 came in late and was not sworn in with the other potential jurors in his presence, reversal is required under *State v. Lloyd*.[45] But *Lloyd* does not require this result. *Lloyd* was a homicide prosecution in which the court reversed and remanded for a new trial on three alternative grounds, one of which involved voir dire.[46] In *Lloyd*, all potential jurors were sworn en masse when they reported for their term of jury service. Thereafter, when jurors were being selected at the beginning of Lloyd's trial, "the trial judge refused to allow jurors called into the box to be sworn as to their general qualifications as jurors, or examined upon their voir dire therefor."[47] The *Lloyd* court ordered a new trial because criminal defendants are entitled to know that jurors are properly sworn and are entitled to be present and to engage in the examination of jurors.[48] Hyder does not claim that he did not engage in voir dire examination of the jury.

¶38 He complains only that juror 25's oath was not administered in his presence. That issue is controlled by *State v. Tharp*.[49] In *Tharp*, through inadvertence, no oath was administered to the prospective jurors before the voir dire examination. Defendant and his counsel attended voir dire, knew of the omission, and did not direct the court's attention to the claimed omission or make any motion or objection in regard to it until after the verdict was received.[50] The *Tharp* court explained that the selection of the jury is "procedural" because it pertains to the manner

---

[45] 138 Wash. 8, 244 P. 130 (1926).

[46] *Lloyd*, 138 Wash. at 15-17.

[47] *Lloyd*, 138 Wash. at 11.

[48] *Lloyd*, 138 Wash. at 15-16.

[49] 42 Wn.2d 494, 256 P.2d 482 (1953).

[50] *Tharp*, 42 Wn.2d at 499.

and form of the trial rather than to the jurisdiction of the court.[51]

> Being a matter of procedure, the omission of the *voir dire* oath was, at most, a trial error. If he intended to rely upon it on appeal, defendant should have urged it to the trial court as soon as he discovered it. . . . Defendant's failure to submit it to the trial court timely, bars our consideration of it as possible error. Otherwise, he could take advantage of any error which he, in fact, invited by permitting it to inhere in his trial unchallenged until after the verdict.[52]

¶39 Here, Hyder and his counsel were aware that juror 25 came in after the other jurors were sworn for voir dire. Any objection to juror 25 should have been made at that time, and Hyder has waived his objection by his silence.[53]

¶40 Moreover, even assuming that Hyder exhausted his peremptory challenges,[54] an alternate juror was excused at the end of testimony. That alternate juror could have been seated in juror 25's place if Hyder had raised this issue in a timely fashion. Under these circumstances, Hyder waived any challenge to juror 25.

¶41 Hyder also asserts that the procedure used to swear juror 25 violated his right to a public trial. However, nothing in the record suggests that juror 25 was sworn in a courtroom closed to the public, only that this juror was sworn outside of Hyder's presence.

## III. Sentencing

¶42 Over Hyder's objection, the court included a prior court-martial conviction in his offender score calculation. This yielded an offender score of 6 and standard ranges of

---

[51] *Tharp*, 42 Wn.2d at 501.

[52] *Tharp*, 42 Wn.2d at 501.

[53] *Tharp*, 42 Wn.2d at 501.

[54] *Tharp*, 42 Wn.2d at 500 ("[Defendant] must show the use of all of his peremptory challenges or he can show no prejudice arising from the selection and retention of a particular juror to try the cause, and is barred from any claim of error in this regard.").

57 to 75 months and 41 to 54 months for counts VI and VII, respectively. Based on the jury's finding of aggravating factors for both counts, the trial court imposed an exceptional sentence of 120 months (78 months for count VI and 42 months for count VII, to be served consecutively). The court also imposed community custody of 36 to 48 months for each count (counts VI and VII), "with confinement not to exceed statutory maximum." The judgment and sentence noted only that the court had entered "oral findings" to support the exceptional sentence imposed.

A. Offender Score/Inclusion of Court-Martial

 ¶43 As a threshold matter, Hyder objects to the trial court's use of a 1986 military conviction in calculating his offender score. Hyder, while a 25-year-old first lieutenant serving at Fort Lewis, pleaded guilty to indecent acts with a female under the age of 16 years. He admitted that he penetrated the girl's (his 14-year-old babysitter's) vaginal lips with his fingers. As part of his sentence, he was dismissed from the military for his conviction of a sex offense. The trial court admitted certified copies of the military conviction and the related investigative report. The State argued that Hyder's admitted conduct was comparable to statutory rape in the third degree, as defined in Washington in 1986. The court did not engage in a detailed comparability analysis, but nevertheless ruled that

> [Hyder] pled [sic] guilty in military court to molesting—I guess that would be our definition, maybe a slightly different definition in the military—a 14-year-old baby-sitter when he was 25 years old and admitted the offense, and there was no appeal and eventually it was affirmed by the higher military court, being no appeal, and he was dismissed from the military at that time as a result of this conviction for a sex offense, and it's certainly relevant and I'm going to admit it for purposes of this sentencing hearing.[55]

---

[55] RP (Jan. 8, 2008) at 32-33.

¶44 *State v. Morley*[56] controls this issue. Relevant here, our Supreme Court held that a defendant's court-martial convictions qualify as convictions under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW; that these convictions are included in the defendant's criminal history; and that prior convictions for sex offenses are always included in the offender score.[57]

¶45 Hyder appears to acknowledge that *Morley* controls because he "urges this court to reconsider *Morley*." Hyder notes that none of those justices voting in the *Morley* majority are still on the court and all of the dissenters in *Morley* remain on the court. While historically accurate, this is irrelevant to this court because we are bound by *Morley* until our Supreme Court holds otherwise.[58] The trial court properly included Hyder's prior court-martial in his offender score calculation.

### B. Exceptional Sentence

#### 1. Written Findings and Conclusions

¶46 Hyder contended in his opening brief that the trial court failed to enter written findings of fact and conclusions of law as required by RCW 9.94A.535.[59] The State conceded the error in its response and asked us to remand for entry of required findings. We did so and provided for supplemental briefing in accordance with *State v. Hale*.[60]

---

[56] 134 Wn.2d 588, 952 P.2d 167 (1998).

[57] *Morley*, 134 Wn.2d at 598-601.

[58] *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) ("[O]nce this court [Washington Supreme Court] has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by this court.").

[59] This statute provides in relevant part, "Whenever a sentence outside the standard sentence range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law."

[60] 146 Wn. App. 299, 304, 189 P.3d 829 (2008); *see also State v. Head*, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998) (Supreme Court refuses to address issues raised on appeal in the absence of required findings and conclusions); *In re Pers. Restraint of Breedlove*, 138 Wn.2d 298, 311, 979 P.2d 417 (1999) (remedy for trial court's

¶47 Hyder now challenges the findings and conclusions entered on remand regarding his exceptional sentence. *Hale* requires that we apply the modified three-prong analysis from *State v. Fowler*,[61] as articulated in *Hale*.[62] First, we determine whether the record supports the jury's special verdict on the aggravating circumstances.[63] This is a factual inquiry.[64] Second, we "review de novo whether the trial court's reasons for imposing an exceptional sentence are substantial and compelling."[65] Third, we determine "whether the trial court abused its discretion by imposing a sentence that is clearly excessive."[66]

## 2. The Record Supports the Jury's Special Findings

¶48 The legislature has provided an "exclusive list" of factors that can support a sentence above the standard range.[67] This case involves two of these factors, whether the offense was part of an ongoing pattern of sexual abuse of the same victim under the age of 18 years, manifested by multiple incidents over a prolonged period of time, and whether the defendant used his position of trust to facilitate the commission of the offense.[68] The record needs to support only one of these factors for us to affirm Hyder's sentence.[69]

¶49 "Generally, the jury must find the facts supporting an aggravated sentence beyond a reasonable

---

failure to issue findings of fact and conclusions of law is remand for entry of the findings and conclusions).

[61] 145 Wn.2d 400, 38 P.3d 335 (2002).

[62] *See Hale*, 146 Wn. App. at 306-09.

[63] *Hale*, 146 Wn. App. at 307.

[64] *Hale*, 146 Wn. App. at 307.

[65] *Hale*, 146 Wn. App. at 308.

[66] *Hale*, 146 Wn. App. at 308.

[67] *See* RCW 9.94A.535(3).

[68] *See* RCW 9.94A.535(3)(g), (n).

[69] *State v. Cardenas*, 129 Wn.2d 1, 12, 914 P.2d 57 (1996) (a sentence will be affirmed if court finds any exceptional factor valid).

doubt."[70] The constitutionally mandated standard for reviewing a jury's factual determination in a criminal case " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*' "[71] The record supports the jury's determination on each aggravating factor. Pertinent to the ongoing pattern factor, Hyder admitted to his therapists that he had sexual contacts with Evelyn for some six years, two to five times a week, from the time Evelyn was age 12 through age 17. From this, a rational trier of fact could have found that the molestation and incest crimes for which Hyder was convicted were part of an ongoing pattern of sexual abuse of Evelyn, who was under the age of 18, as manifested by multiple incidents over a prolonged period of time.

¶50 Pertinent to the use of a position of trust factor, Evelyn testified that when she was younger, Hyder "guilted" her into engaging in improper sexual contacts with him, in part by saying things such as, "[H]oney, I need you right now . . . you can't leave me now. I need you at this moment. I am very lonely . . . I need you to be with me . . . you are hurting me by going. You need to stay with me."[72] Evelyn testified that when she was older and more forceful about not wanting to engage in sexual contacts with Hyder, his gentle, persuasive pleading turned into anger and violence. Evelyn testified that once, when she did not want to massage Hyder's penis, he said, "I worked all day and you can't even, you know, kiss your father and be affectionate to your father when he needs you[?]" Evelyn also testified that if she did not comply with Hyder's sexual contacts he would find things to get upset about and be angry with the other children and hit them. From this record, a rational trier of fact could find that Hyder used his position of trust to facilitate the crimes at issue.

---

[70] *Hale*, 146 Wn. App. at 304.

[71] *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

[72] Hyder's therapist explained that Hyder viewed Evelyn "as a lover."

¶51 Hyder argues that the aggravating factors merely reflected elements in the charged crimes as instructed and thus cannot support an exceptional sentence under *State v. Ferguson*.[73] We disagree.

¶52 In relevant part, the trial court instructed the jury as follows:

### INSTRUCTION No. 13

To convict the defendant of Child Molestation in the Second Degree, as charged in Count 6, each of the following elements must be proved beyond a reasonable doubt:

(1) That on or about or between December 28, 1996, to December 27, 1998, the defendant had sexual contact with Evelyn Hyder;

(2) That Evelyn Hyder was at least twelve years old but less than fourteen years old at the time of the sexual contact and was not married to the defendant;

(3) That Evelyn Hyder was at least thirty-six months younger than the defendant; and

(4) That this act occurred in Grays Harbor County, Washington.

. . . .

### INSTRUCTION No. 14

The State alleges that the defendant committed acts of Child Molestation in the Second Degree on multiple occasions. To convict the defendant of Child Molestation in the Second Degree, one particular act of Child Molestation in the Second Degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Child Molestation in the Second Degree.

### INSTRUCTION No. 15

To convict the defendant of the crime of Incest in the Second Degree, as charged in Count 7, each of the following elements of the crime must be proved beyond a reasonable doubt:

---

[73] 142 Wn.2d 631, 647-49, 15 P.3d 1271 (2001) (sentences above the standard range must be based on some fact not already inherent in the crime of conviction).

(1) That on or about or between December 28, 1998, to December 27, 2002, the defendant engaged in sexual contact with Evelyn Hyder;

(2) That the defendant was related to Evelyn Hyder either legitimately or illegitimately as an ancestor or descendant of either the whole or the half blood;

(3) That at the time, the defendant knew the person with whom he was having sexual contact was so related to him; and

(4) That any of these acts occurred in Grays Harbor County, Washington.

. . . .

## INSTRUCTION NO. 16

The State alleges that the defendant committed acts of Incest in the Second Degree on multiple occasions. To convict the defendant of Incest in the Second Degree, one particular act of Incest in the Second Degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Incest in the Second Degree.[74]

¶53 Read together, instructions 13 and 14 direct the jury that in order to convict Hyder on count VI, they must unanimously agree on the act in which all of the noted elements of second degree child molestation occurred. Similarly, instructions 15 and 16, read together, direct the jury that in order to convict Hyder on count VII, they must unanimously agree on the act in which all of the noted elements of second degree incest occurred. Thus, a single act of the noted conduct is all that is required for a conviction on counts VI and VII, respectively. The jury so found, and the record supports those verdicts.

¶54 The noted elements are different from the requirements of the "ongoing pattern" aggravating factor which requires multiple incidents of abuse of the same minor over

---

[74] Clerk's Papers (CP) at 17-18.

a prolonged period of time. Accordingly, Hyder's assertion that this factor cannot support his exceptional sentence fails.

¶55 Similarly, the noted elements in the to-convict instructions do not include that Hyder used his position of trust to facilitate the crime. Hyder argues that in the present case, his status as Evelyn's father meets both the family relationship element of the incest instruction and the position of trust element of the aggravating factor; thus, the required elements are indistinguishable, and the aggravating factor cannot support an exceptional sentence. This court disagrees. As set forth in instruction 15 above, the relevant inquiry is whether the defendant is related to the person with whom he has sexual contact and that he knows of that relationship. The position of trust aggravating factor requires that the defendant used his position of trust to facilitate the crime. Thus, relevant to the present issue, count VII requires only that Hyder knew he was related to Evelyn when he molested her. In contrast, the noted aggravating factor requires that he used his position of trust to facilitate the crime. The elements are not the same, and Hyder's assertion that the "position of trust" aggravating factor cannot support his exceptional sentence fails.

¶56 In sum, the record contains sufficient evidence to support the jury's findings as to both aggravating factors.

### 3. Trial Court's Reasons Are Substantial and Compelling

¶57 *Hale* requires that we next "review de novo whether the trial court's reasons for imposing an exceptional sentence are substantial and compelling."[75] The trial court here entered written findings and conclusions on remand that reiterated the jury's special verdict. The court's findings of fact noted that the jury found Hyder guilty of counts VI and VII, noted that the jury returned special verdicts on each of the convictions, and recited the language of the

---

[75] *Hale*, 146 Wn. App. at 308.

special verdicts. The trial court then concluded as a matter of law that, for each of the counts (counts VI and VII), (1) the jury found the aggravating circumstances, (2) the facts found by the jury in the special interrogatories "are substantial and compelling reasons justifying an exceptional sentence" for each of the counts, (3) a sentence above the standard range "is in the interest of justice and consistent with the purposes of the Sentencing Reform Act," and (4) "an exceptional sentence is appropriate to ensure that punishment is proportionate to the seriousness of the offense." Addressing comparable findings and conclusions in *Hale*, we determined that the trial court's reasons for imposing an exceptional sentence were substantial and compelling.[76] We do so here, as well.

¶58 The only difference between the written findings and conclusions here and in *Hale* is the incorporation of the court's "oral findings of 1/8/08." The trial judge accomplished this with a handwritten notation, prompted by the request of defense counsel, who appeared telephonically. Hyder now contends that the trial court erred to the extent the written findings and conclusions incorporate the court's oral findings. He also asserts that the trial court improperly relied on facts beyond those found by the jury in imposing an exceptional sentence. We reject Hyder's contentions.

¶59 As a threshold matter, if the trial court erred by incorporating its oral ruling into its written findings, Hyder appears to have invited it. The trial court was not inclined to incorporate its earlier oral findings in its written findings entered on remand because they had already been referenced in the judgment and sentence. But the court did so at the request of defense counsel.[77]

---

[76] *Hale*, 146 Wn. App. at 308.

[77] *See Korum*, 157 Wn.2d at 646 (under invited error doctrine a party may not set up error at trial and then complain about the error on appeal); *State v. Recuenco*, 154 Wn.2d 156, 163, 110 P.3d 188 (2005) ("The invited error doctrine prevents parties from benefiting from an error they caused at trial regardless of whether it was done intentionally or unintentionally."), *rev'd on other grounds*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006).

¶60 In any event, Hyder's substantive argument is unconvincing. Hyder quotes at length from the trial court's comments at the sentencing hearing, arguing that the trial court imposed an exceptional sentence based on facts not found by the jury. But a careful reading of the transcript shows that the trial court applied only the aggravating factors found by the jury in imposing the exceptional sentence. The court's additional comments, upon which Hyder focuses, were in response to defense counsel's lengthy argument in mitigation. Hyder's counsel read many letters supporting Hyder into the record, took testimony from Hyder's psychotherapist on Hyder's present dangerousness to himself and others, and asked for a lenient sentence in light of the emotional and financial impact that any sentence would have on Hyder's six children, who still lived with their mother. Defense counsel also vehemently argued that the crimes Hyder was convicted of had "no impact" on Evelyn and that, in fact, Hyder was the victim here.[78] The court responded to Hyder's lengthy argument in mitigation in kind, explaining its rejection of each of defense counsel's proffered bases for mitigation and a lenient sentence.

¶61 In imposing the exceptional sentence, the court applied only the jury's findings. In the relevant portion of its oral decision, the court stated as follows,

> The jury did find, after careful deliberation, he did commit child molestation in the second degree regarding Count 6; and regarding Count 7, that he committed incest. And the jury also found the following aggravating circumstances regarding both counts. They found, regarding both child molestation and the incest, that the offense was part of an ongoing pattern of sexual abuse of Evelyn Hyder, a person under the age of 18 years, as manifested by multiple incidents over a prolonged period of time. They also found that the defendant used his position of trust to facilitate the commission of the current offense.
>
> And I have listened to everything from day one and even before the jury started hearing this case, and I've heard it all.

[78] RP (Jan. 8, 2008) at 54, 92.

I believe the jury was absolutely correct in their decision. In fact, if they would have found him guilty of some of the other counts, there would have certainly been substantial evidence to warrant the guilty finding, *but I can't take that into consideration, and I won't because I will follow the findings of the jury.*[79]

(Emphasis added.) The court also said,

[W]hen I look at everything objectively in this case, I find that there are substantial and compelling reasons to exceed the standard range sentences regarding both counts. I'll tell you my reason behind that.

The courts instruct us to look at this particular charge, child molestation in the second degree or incest, and somehow measure whether it is typical—whether the conviction in this case is typical of what happens in this type of case. And this is not typical or ordinary, and thank God for that.[80]

The court explained,

It is not typical to have molestation go on for years and years as it did occur in this case according to the finding—the aggravating finding of the jury. So it went on for a prolonged period of time, as I said, and they found a violation of trust, and it's not typical, fortunately, that natural fathers violate their daughters the way Mr. Hyder violated Evelyn. I can't imagine who you would have more trust in if a child is in a good relationship with a good father. I agree that a good father would risk his life or sacrifice his life to protect his daughter from this sort of assault. But what happens when the molest[e]r is your father? Who is going to protect Evelyn?[81]

The court concluded,

So I'm imposing this exceptional sentence not because of what he did in 1985 [regarding court-martial conviction]; it's because of what he did to his daughter Evelyn in molesting her, in committing incest; the fact that it was probably the greatest violation of trust that I can imagine.

---

[79] RP (Jan. 8, 2008) at 125-26.

[80] RP (Jan. 8, 2008) at 126.

[81] RP (Jan. 8, 2008) at 127-28.

. . . .

What I'm going to do, I'm going to impose a sentence—I'm not just going to immediately agree with the State and say I'm going to give the maximum. That's not appropriate thinking. I think a very severe sentence is warranted in this case. An exceptional sentence is warranted due to the finding of the aggravating circumstances set forth in the jury verdict on both counts. I'm going to impose 78 months on Count 6, which is the child molestation in the second degree. I'm going to impose 42 months on Count 7, which is the incest, and I'm going to make them consecutive, for a total of 120 months in prison.[82]

Under this record, we reject Hyder's contention that the trial court improperly relied on facts not found by the jury in imposing the exceptional sentence.

¶62 Hyder also contends that after *Blakely v. Washington*,[83] the determination of whether statutory aggravating factors are *substantial and compelling* is a jury question.[84] He contends that under *Blakely*, this quality is a fact that also must be found by a jury beyond a reasonable doubt. But our Supreme Court has repeatedly rejected this notion. In *State v. Alvarado*,[85] our Supreme Court explained that "*Blakely* . . . recognized that the determination of whether particular circumstances (once established) warrant an exceptional sentence remains a legal judgment for the court." " 'The inquiry . . . , *whether there were substantial and compelling reasons for an exceptional sentence*, is a legal conclusion that the trial court is still allowed to make

---

[82] RP (Jan. 8, 2008) at 134-35.

[83] 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[84] In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the United States Supreme Court held that other than the fact of a prior conviction, the Sixth Amendment requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Subsequently, in *Blakely*, 542 U.S. at 303, the Court held that the statutory maximum under *Apprendi* is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.

[85] 164 Wn.2d 556, 567, 192 P.3d 345 (2008) (citing *Blakely*, 542 U.S. at 305 n.8).

following *Blakely.*' "[86] Addressing the post-*Blakely* "division of responsibility between jury as fact finder and judge as sentencing authority," the *Alvarado* court noted that "*Blakely* underscores the role of the judge in determining whether particular circumstances constitute substantial and compelling grounds to impose an exceptional sentence."[87] Hyder's contrary contention fails.

¶63 For the noted reasons, we affirm the trial court's determination that the reasons for imposing an exceptional sentence in Hyder's case were substantial and compelling.

### 4. Whether the Sentence Is Clearly Excessive

¶64 Finally, we must decide whether the trial court abused its discretion by imposing a clearly excessive sentence.[88] In *Hale* we held that the trial court's imposition of an exceptional sentence (incarceration period) that was roughly midway between the highest standard range sentence of the charged offense and the statutory maximum was not clearly excessive and thus not an abuse of discretion.[89] Here, Hyder acknowledges that the applicable statutory maximum sentence is 15 years.[90] The exceptional 120-month incarceration period is roughly midway between the maximum standard range of 75 months and the acknowledged statutory maximum of 180 months.

¶65 But *Hale* did not address any community custody period. Here, in addition to the incarceration period of 120 months, the trial court imposed a community custody period of 36 to 48 months for each of the convictions. Hyder

---

[86] *Alvarado*, 164 Wn.2d at 568 (emphasis added) (quoting *State v. Hughes*, 154 Wn.2d 118, 140, 110 P.3d 192 (2005), *abrogated on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)).

[87] *Alvarado*, 164 Wn.2d at 568-69 (citing *Blakely*, 542 U.S. at 305 n.8).

[88] *Hale*, 146 Wn. App. at 308.

[89] *Hale*, 146 Wn. App. at 308-09.

[90] Presumably, Hyder means the maximum for his consecutive sentences. *See* CP at 35-36 (judgment and sentence indicating maximum term for count VI is 10 years (second degree child molestation under RCW 9A.44.086), and maximum term for count VII is 5 years (second degree incest under RCW 9A.64.020(2)).

argues that "the two terms of community custody total 72-96 months. He claims that his overall total sentence is thus 192-216 months [16-18 years]—more than the statutory maximum of fifteen years [180 months]."

¶66 Hyder initially argued that the imposition of a set confinement period and a range of community custody, with the exact amount of community custody being determined ultimately by the effect of any earned early release time, amounted to an indeterminate sentence and, thus, was invalid. In so arguing, Hyder relied on Division One's decision to that effect, *State v. Linerud*.[91] After Hyder filed his opening brief, *Linerud* was overruled by *In re Personal Restraint of Brooks*.[92] *Brooks* specifically rejected the indeterminate sentence argument that Hyder makes here.[93] In his reply, Hyder acknowledges that *Brooks* controls any issues regarding whether his sentence is indeterminate or within the statutory maximum.

¶67 As to whether Hyder's sentence exceeds the statutory maximum, *Brooks* directs that under the SRA a sentencing court may not impose a sentence providing for a term of confinement or community custody that exceeds the statutory maximum for the crime.[94] Further, "[w]here a sentence is insufficiently specific regarding community custody, an amended sentence is the appropriate remedy."[95] The *Brooks* court held,

> [W]hen a defendant is sentenced to a term of confinement and community custody that has the potential to exceed the statutory maximum for the crime, the appropriate remedy is to remand to the trial court to amend the sentence and explicitly

---

[91] 147 Wn. App. 944, 197 P.3d 1224 (2008).

[92] 166 Wn.2d 664, 211 P.3d 1023 (2009).

[93] *See Brooks*, 166 Wn.2d at 673-74.

[94] *Brooks*, 166 Wn.2d at 668.

[95] *Brooks*, 166 Wn.2d at 673.

state that the combination of confinement and community custody shall not exceed the statutory maximum.[96]

¶68 Here, the judgment and sentence orders community custody for each conviction, stating, respectively, for counts VI and VII, "[community custody is ordered] for a range from 36 to 48 months; with confinement not to exceed statutory maximum." Because Hyder's sentence does not clearly state that the combined term of incarceration and community custody shall not exceed the statutory maximum, remand is required for clarification of his sentence as directed in *Brooks*.[97] Hyder's sentence is not either clearly excessive or an abuse of the trial court's discretion.[98] Aside from remand for clarification as required by *Brooks*, we affirm.

## CONCLUSION

¶69 Because RCW 26.44.030 makes inapplicable any therapist-client privilege and a search warrant procedure was available to obtain the records of Hyder's therapist, the trial court properly admitted the testimony of Hyder's therapists. The record supports the jury's findings on aggravating factors for sentencing. The issue of whether statutory aggravating factors found by a jury as required by RCW 9.94A.535(3) are substantial and compelling is a legal question to be decided by a judge rather than a jury. The trial court did not err in determining this issue or imposing an exceptional sentence. Hyder waived any error made in

---

[96] *Brooks*, 166 Wn.2d at 675.

[97] *See also State v. Vant*, 145 Wn. App. 592, 605-06, 186 P.3d 1149 (2008).

[98] *See Hale*, 146 Wn. App. at 308-09; *cf. State v. Vance*, 168 Wn.2d 754, 762-63, 230 P.3d 1055 (2010) (trial judge did not err by imposing exceptional consecutive sentences for defendant's three convictions for first degree child molestation while running his other convictions concurrently (i.e., two counts of second degree child molestation and three counts of communicating with a minor for immoral purposes) for a total term of imprisonment of 594 months); *cf. State v. Cubias*, 155 Wn.2d 549, 554, 120 P.3d 929 (2005) (though the imposition of consecutive sentences increases a defendant's aggregate term of imprisonment, so long as the sentence for any single offense does not exceed the statutory maximum for *that* offense, *Blakely* is not offended).

swearing juror 25. However, Hyder's judgment and sentence leaves unclear whether the combined terms of incarceration and community custody exceed the statutory maximum. Therefore, we remand for clarification of the community custody term and otherwise affirm Hyder's convictions and sentence.

PENOYAR, C.J., and WORSWICK, J., concur.